STATE OF MAINE
*vs.*
GAYLON L. WARDWELL

Aroostook. Opinion, August 21, 1962.

*Ferris A. Freme, County Attorney,* for the State.

*Melvin E. Anderson,* for the Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ. DUBORD, J., did not sit.

SIDDALL, J. In the early morning hours of March 6, 1960, the respondent's home was destroyed by fire. The respondent and two of his children escaped the flames. The body of an adult female, burned beyond recognition, was found on a bed in the easterly section of the house. After an investigation the respondent was arrested and charged

with murder. He was convicted of murder after trial by a jury, and, after verdict, seasonably filed a bill of exceptions containing twenty separate exceptions. After denial of a motion for a new trial by the presiding justice, respondent appealed.

EXCEPTION #1.

On April 22, 1960, the court appointed Melvin Anderson, Esq. and Albert Stevens, Esq. counsel for the respondent. A motion for continuance was filed by the respondent through his counsel. The affidavit accompanying the motion, dated April 26, 1960, alleged that counsel could not safely proceed to trial because they felt that they did not have sufficient time in which to adequately prepare for respondent's defense, because it appeared that the cause of death of the alleged victim was uncertain and involved medico-legal problems requiring defense counsel to obtain the advice and opinion of qualified physicians and particularly one specializing in pathology. It also alleged that counsel did not at that time have available copies of the medical examiner's initial report, the autopsy report, or the official report from the superintendent of the State Hospital at Augusta where the respondent had been sent for observation.

On April 27 a hearing was held on the motion for a continuance. At that time it appeared that the respondent's attorneys had in their possession all of the reports mentioned in the motion. It also appeared that the respondent's attorneys had listened to the tape recording made during the investigation, and that the State had made available to said attorneys all evidence then in the possession of the State. The motion was denied by the court.

> "Continuances and mistrials are within the discretion of the presiding justice. *Cunningham v. Long*, 125 Me. 494, 497; *Collins v. Dunbar*, 131 Me.

337; *Bank v. Shaw*, 79 Me. 376; *Graffam v. Cobb*, 98 Me. 200; *Rumsey v. Bragg*, 35 Me. 116. In the absence of anything tending to show that this discretion was not properly exercised, the ruling is not subject to valid exceptions. *Fitch v. Sidelinger*, 96 Me. 70, 71. 'The chief test as to what is or is not a proper exercise of judicial discretion is whether in a given case it is in furtherance of justice. If it serves to delay or defeat justice it may well be deemed an abuse of discretion.' *Charlesworth v. Express Co.*, 117 Me. 219, 221, see also *State v. Bobb*, 138 Me. 242; *Bourisk v. Mohican Co.*, 133 Me. 207."
*State* v. *Hume*, 146 Me. 129, 134.

The granting of a continuance in a criminal case based upon want of time to prepare a defense rests in the sound discretion of the presiding justice. *Commonwealth* v. *Klangos*, 326 Mass. 690, 96 N. E. (2nd) 176. See also 14 Am. Jur. Criminal Law, Sec. 131; 22A C. J. S., Criminal Law, Sec. 496, p. 146.

At the hearing on the motion for continuance no mention was made in respect to any inability of the respondent's counsel to proceed with the trial. Mr. Anderson had been appointed by the lower court to represent the respondent at the preliminary hearing held in March, 1960. Although his responsibility to the respondent ceased after the hearing, at the time of his appointment by the Justice of the Superior Court he necessarily had knowledge of the general facts in the case. The record satisfies us that the court was justified in believing that respondent's counsel, having received the various reports, were willing to proceed with the trial on the date set by the court. In fact, counsel appointed to represent the respondent in the post-trial proceedings conceded in oral argument that the court was justified in denying the motion for a continuance. However, he took the position that the court, on its own initiative, at some stage in the trial of the case, should have taken steps to

protect the interest of the respondent, presumably by declaring a mistrial and continuing the case. The record shows that the respondent had a pathologist present in court whose testimony was confined to answering one hypothetical question. This exception is overruled.

EXCEPTIONS #2 AND 3 are waived by respondent.

EXCEPTIONS #4 AND 5.

These exceptions relate to the admissibility of photographs of the dead body, one with a cloth wrapped about the neck of the deceased, and the other with the cloth removed. The recent decision of *State* v. *Duguay*, reported in 158 Me. 61 contains an exhaustive review of the law relating to the admissibility of photographs of dead bodies. Reference is made to this opinion and to the cases and authorities cited therein. The substance of the opinion affecting this issue is that the admissibility of such photographs rests upon the exercise of sound judicial discretion; that such photographs when properly taken are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant.

These photographs were properly taken, and we believe they were relevant to the issues of the case, particularly as an aid to the oral testimony of the physicians in relation to the area of the body beneath the cloth about the neck. They were no more gruesome than the evidence of the physicians and others relating to the condition of the body. We find no abuse of judicial discretion in admitting the photographs in evidence. These exceptions are overruled.

EXCEPTION #6.

During the course of the trial Dr. Philpot, pathologist for the Cary Memorial Hospital of Caribou, was asked to

give his opinion on the cause of death based upon a hypothetical question. The court allowed the doctor to give such an opinion, and his answer was as follows: "My opinion as to the cause of death on this body is death due to strangulation." The only claim by the respondent in his bill of exceptions is that the opinion was not based upon a proper foundation. It appeared in evidence that Dr. Philpot assisted by Dr. Reynolds performed an autopsy on the body of the deceased. The various organs of the body were found to be essentially normal, and the most important abnormalities were found in the examination of the larynx. The autopsy disclosed a fracture in the thyroid cartilage and three fractures of the cricoid cartilage. Dr. Philpot testified that in his opinion the fractures were caused by trauma of considerable force. Muscle tissue was removed from the area surrounding these fractures. This tissue was examined microscopically by Dr. Philpot and the examination revealed hemorrhages therein, indicating, according to his testimony, that the deceased was alive at the time of the hemorrhages. There was also evidence that the autopsy disclosed no evidence of soot or smoke in the inner throat, indicating according to Dr. Philpot's testimony that death had occurred before the fire. At the time of the autopsy, Dr. Philpot withdrew blood from the body for the purpose of chemical analysis. In order to determine whether death was due to carbon monoxide poisoning, a portion of this blood was analyzed by Dr. Chapman for the detection of carbon monoxide. The test used by him was a color test to detect gross differences. After the application of certain chemicals, he compared the color of the blood sample with the color of a blood sample taken from his own body. He found no difference in color, indicating to him that the percentage of carbon monoxide was not higher than normal. He testified that the result of the test was that he could find no evidence of any high or any concentration of carbon monoxide hemoglobin. The test did not purport to show

the exact percentage of carbon monoxide, and a blood sample was sent to the Federal Bureau of Investigation for an exact determination percentagewise. Mr. Strickland, a chemist for the Federal Bureau of Investigation, testified that the blood sample contained approximately 10% carbon monoxide saturation. Dr. Philpot also gave testimony indicating that a much higher percentage than 10% of carbon monoxide was necessary to cause death. The qualification of Dr. Philpot as a pathologist was not challenged, nor was any challenge made of the qualifications of Dr. Chapman and Mr. Strickland to conduct and interpret the tests made by them. The hypothetical question was based upon the complete autopsy performed by the witness himself, including microscopic examination of the organs of the body and of the muscle tissue and upon the results of the blood tests testified to by Dr. Chapman and Mr. Strickland. A sufficient foundation had been laid, and the court was not in error in allowing the question to be answered.

Although this question was not raised by the bill of exceptions, the respondent in argument contends that the doctor by his answer, in effect, testified that someone strangled the deceased. No claim to this effect was made at the time of the answer. The answer carried no inference that the strangulation was caused by a human agency. The doctor was testifying as a medical expert, and his answer is to be interpreted in that light. This was apparently recognized by counsel for the respondent as appears from the following testimony of the doctor in answer to inquiries by respondent's counsel.

"Q Now you have stated your opinion, rather, on the cause of death here as being due to strangulation. Is there any particular type of strangulation that you are referring to?

A No.

Q In other words, there are various means or descriptions of strangulation?

A  Yes.

Q  What is the medical, as opposed to the common construction of the word "strangulation"? When you say strangulation, would you explain the pathology that ensues to cause death to us?

A  Well, the medical term used for the cause of death in strangulation I believe would be anoxia, lack of oxygen.

Q  What happens? Would you explain that, the reaction that occurs thereafter?

A  Yes. The air passageways are cut off from the external air, and the patient may struggle to breath but it cannot get air into the lungs. There is a lack of oxygen in the blood stream and death results from lack of oxygen."

We find the answer to be a proper expression of opinion. Its evidential weight was for the jury. This exception is overruled.

EXCEPTION #7.

Dr. Philpot was asked if he had formed an opinion as to the cause of death before tests were made on the muscle tissue. He answered in the affirmative and then stated that his opinion before the examination of the muscle tissue was that the death was due to strangulation. The respondent claims the admission of the evidence was error because he claims that Dr. Philpot had previously incorporated a supplemental microscopic examination of the muscle tissue as a basis in forming his opinion as to the cause of death. Dr. Philpot testified on cross-examination that the results of his supplemental report was one of the bases upon which his opinion as to the cause of death was formed. He also later testified that the discovery of blood in the muscle tissue was one of many factors that led him to that conclusion. The doctor testified that the lack of soot and smoke in the

inner throat indicated that death had occurred before the fire, and that the color of certain organs and particularly the color of the blood taken from the body indicated that death was not from carbon monoxide poison. Although the question, in the light of the previous opinion given by the doctor after all tests were completed, probably served no useful purpose in the trial, a proper foundation had been laid for its admission. This exception is overruled.

EXCEPTION #8.

This exception relates to a hypothetical question propounded to Dr. Reynolds and his answer that he believed the cause of death was due to strangulation. Dr. Reynolds at the time of the fire was a medical examiner of Aroostook County. He assisted Dr. Philpot in the autopsy. The hypothetical question was based upon the personal observations and findings of Dr. Reynolds himself; also upon certain assumed results of blood tests made by Mr. Strickland and Dr. Chapman and upon certain assumed results of microscopic tests made by Dr. Philpot.

> "Concerning the form and scope of the hypothetical question and the extent and limitation of its assumption of facts and circumstances much must be left to the discretion of the presiding Justice. In framing a hypothetical question the practice is for the question to contain the assumption of the existence of such facts and conditions as the jury may be authorized to find upon the evidence as it then is, or as there may be good reason to suppose it may thereafter appear to be."
>
> State v. Vino Medical Co., 121 Me. 438, 444.

The respondent claims that a proper foundation had not been laid for the question; that it omitted material facts having a bearing on causation and included material facts and assumptions which were not supported by the evidence. The nature of these facts was not disclosed either in re-

spondent's brief or at the time the objection was raised at the trial. The respondent argues that the question assumed the result of Dr. Chapman's test revealed "no evidence of any high or any concentration of carbon monoxide hemoglobin." Dr. Chapman's test did not purport to show the exact amount of carbon monoxide hemoglobin in the blood, and unless the test showed a high concentration of carbon monoxide in the blood, was not sensitive enough to show if any carbon monoxide was present. On the other hand the test conducted by the Federal Bureau of Investigation was a test designed to show the exact percentage of carbon monoxide hemoglobin in the blood. The jury understood the purpose, scope and limitation of both tests. We find nothing objectionable in the form of the question as propounded. The existence of the assumed facts was warranted by the evidence.

The respondent also claims that the continuity of possession of the various specimens had not been established. We have carefully examined the record and find that the chain of custody of the blood samples was properly accounted for from the time they were taken by Dr. Philpot from the body of the deceased to the time of examination by Dr. Chapman and Mr. Strickland.

The respondent also makes the same claim as in exception six that the doctor was invading the province of the jury in giving his opinion that death was due to strangulation. The contention of the respondent in this respect has already been discussed under his exception #6 in regard to the same opinion expressed by Dr. Philpot. The same considerations apply here. The doctor's answer was a proper expression of opinion, and its weight was for the jury. This exception is overruled.

EXCEPTION #9.

This exception relates to the admission of a certain cloth as an exhibit in the case. At the time of the autopsy the

cloth was taken from around the neck of the deceased. It was identified as being similar in color and design to a nightgown seen on Wednesday before the fire at the foot of the bed used by Anita Wardwell. The exhibit was admissible as bearing on the identification of the body of the deceased. The respondent claims that the continuity of custody of the exhibit had not been sufficiently shown. Again, the respondent does not pinpoint where he claims the break in continuity occurred. We have examined the record and do not find any merit in respondent's claim. The exception is overruled.

EXCEPTIONS #10, 11, 12 AND 13.

These exceptions concern State's exhibits #9, 10, 12 and 13. These were various specimens sent by the State to the Federal Bureau of Investigation laboratories in Washington for analysis. These specimens were delivered on March 21, 1960, by Deputy Sheriff Parlee personally to the laboratory. They were delivered to Ralph W. Strickland, a Special FBI Agent assigned to the laboratory. The specimens were analyzed by Mr. Strickland and returned by him in Washington to Deputy Sheriff Parlee on April 4, 1960. Mr. Strickland testified at the trial. The respondent contends that no testimony was given by Mr. Strickland in regard to where the specimens were kept in the laboratory or under whose custody and control they were or what happened to them during the interval between March 21 and April 4, 1960. The specimens were delivered to a responsible agency of government and received by the same person who made the chemical analysis of them. He appeared in court as a witness and was subject to cross-examination. The witness was allowed to testify in regard to the results of the chemical analyses without objection on the part of the respondent's counsel based upon these grounds. Furthermore, no attempt was made by cross-examination to show

that the specimens were not properly protected while at the laboratory.

Any claim by the respondent that the State did not show sufficient continuity of possession to allow the admission of these exhibits in evidence is without merit. We have carefully gone over the record and are unable to find any break in the continuity of possession or custody. These exceptions are overruled.

EXCEPTIONS #14 AND 15 are waived.

EXCEPTION #16.

This exception relates to the testimony of Frederick D. Gates, a Supervisor and State Fire Inspector. He testified that he had taken courses in fire prevention, arson investigation, and some courses in electricity, heating units, stoves, furnaces, etc. He testified that he had inspected about 500 fires, and had inspected 300 or 350 stoves in the course of his duties. He examined both stoves in the Wardwell home for the purpose of determining whether either of the stoves had exploded, and described the manner of his inspection. Against respondent's objection he was permitted to give an opinion that neither stove had exploded.

Whether a witness called as an expert possesses the necessary qualifications is a preliminary question for the court. The decision is conclusive unless it clearly appears that the evidence was not justified or that it was based upon some error of law. *Hunter* v. *Tolman,* 146 Me. 259, 268. We see no error in admitting this testimony. Its weight was for the jury. This exception is overruled.

EXCEPTIONS #17 AND 18.

These exceptions relate to the testimony of two State Police officers in relation to a confession made by the re-

spondent. The officers testified that the respondent first told them that he had fallen asleep and that when he awoke the room was filled with smoke. He took his children out but the fire was too hot for him to save his wife. The officers also testified in substance that after further questioning the respondent told them that on the night of the fire he and his wife had an argument, and that he grabbed her and choked her until she went limp, and that he then poured kerosene on her and touched it off. The officers testified that he also told them that he had been planning the act for some time. The respondent objected to this testimony on the ground that the State had not established the corpus delicti and that the body had not been identified as that of Anita Wardwell. The respondent also claims that these statements were not voluntarily and freely made.

We take up first respondent's claim that the confession was not voluntarily made. The test of the admissibility of statements or confessions is whether they were made willingly, or whether they were extorted by some threat or elicited by some promise. *State* v. *Priest*, 117 Me. 223, 228.

We find no evidence that the confession was made under threats or induced by any promises. On the contrary, one of the officers advised the respondent that he did not have to answer any questions, but if he did, his answers could be used against him. The record shows that the confession was made willingly and voluntarily.

The use of extra-judicial confessions to prove or corroborate the commission of a crime has been discussed in several recent Maine cases.

In *State* v. *Hoffses*, 147 Me. 221, 226, the court quoted Wharton's Criminal Evidence, Sec. 641, as follows:

> "It has been said that the corroboration of an extra-judicial confession is met if the additional evidence is sufficient to convince the jury that the crime

charged is real, and not imaginary; and again that it is sufficient if the independent evidence establishes the corpus delicti to a probability."

In *State* v. *Carleton*, 148 Me. 237, 240, the court called attention to the *Hoffses* case and to the quotation in Wharton's Criminal Evidence referred to therein, and said, "We think a proper interpretation of this quotation from Wharton means that to establish the corpus delicti to a probability the evidence introduced must be such that a reasonable inference of the existence of the corpus delicti may be deduced therefrom without reliance to the slightest degree upon the confession."

In *State* v. *Jones*, 150 Me. 242 our court said:

"We know the Hoffses case established a measure of *some* evidence as held in the Levesque case to be such credible evidence as standing alone to create a really substantial belief that a crime had actually been committed."

In *State* v. *McPhee*, 151 Me. 62, 65, the court said:

"Any statement by the respondent was not admissible until some evidence independent of such extra-judicial admission or confession had been legally admitted. The meaning of 'some evidence' has been held to be such credible evidence, as, standing alone, will create a really substantial belief that a crime has actually been committed."

In *State* v. *Woodworth*, 151 Me. 229, the court held that before admissions of the respondent are admissible the State must prove to a probability that the crime charged had been committed.

It appears from these decisions that it is not necessary to prove the corpus delicti beyond a reasonable doubt before extra-judicial confessions are admissible. Although the opinions use different language, we do not consider that there is any essential difference in the term "in all prob-

ability" as used in the *Hoffses* and the *Woodworth* cases and in the words "substantial belief" as used in the *McPhee* and *Jones* cases. However, in order to prevent any confusion we rule that it is a sufficient foundation for the admission of a confession or statement by the accused if the State at that time has presented such credible evidence as will create a really substantial belief that the crime charged has actually been committed by someone. It is not necessary to identify the accused as the perpetrator of the crime charged before establishing the basis for the admission of an extra-judicial confession. Such is the overwhelming weight of authority. See Wigmore on Evidence, 3d Edition, Vol. VII, p. 402; Wharton's Criminal Law, Vol. 1, Sec. 348, p. 452; *State* v. *Boswell, et al.*, 73 R. I., 358, 56 A. (2nd) 196; 23 C. J. S. Criminal Law Sec. 916 (1) ; 20 Am. Jur. Evidence, Sec. 1242; 127 A. L. R. 1130, 1140 (Annotation) ; 45 A. L. R. (2nd) 1316, 1336 (Annotation). However, when the case finally reaches the jury there must be such extrinsic corroborative evidence of the corpus delicti as will, when taken in connection with the confession or admission, establish in the minds of the jury beyond a reasonable doubt that the crime charged was committed and that the respondent committed it.

In the instant case the State must first establish the identity of the burned body as that of Anita Wardwell. Where, as in this case, the body is burned beyond recognition, circumstantial evidence is admissible to establish identity. Anita Wardwell, at the time of the fire, was pregnant with child to such an extent that her condition was apparent from observation. She was at that time living in the house in which the fire occurred. She was last seen on the premises during the afternoon of the fire. She has not been seen since by those who would be in a position to see her. The evidence indicates that the respondent was on the premises at the time of the fire. The body found on the bed after the fire was that of an adult female. The evidence

indicated that the person burned was pregnant, and the foetus of an unborn child was found on the floor near the bed. The nightgown draped around her neck was similar in color and pattern to one seen on the bed used by Anita Wardwell. Sufficient evidence had been introduced to establish the identity of the dead body as being that of Anita Wardwell.

At the time of the testimony of the State Police Officers, the State had presented evidence that an autopsy had been performed on the burned body. This autopsy, including the microscopic examination of the organs of the body showed no significant abnormalities except in the area of the larynx. The autopsy disclosed fractures in the thyroid and cricoid cartilages. The thyroid cartilage is commonly termed the "adam's apple." The cricoid cartilage encircles the top of the windpipe. There was medical evidence that there were hemorrhages in the muscle tissue in the area of these fractures, indicating, according to that evidence, that the fractures had occurred prior to death. There was testimony by the doctor who performed the autopsy that in his opinion the hemorrhages were caused by a blow or pressure of considerable force. Dr. Reynolds testified that in his opinion the fractures were caused by an external force. There was evidence tending to show that death did not occur from monoxide poisoning. The autopsy disclosed no smoke or soot in the inner throat, which indicated, according to the doctors' testimony that the deceased was dead at the time of the fire. There was evidence that the cloth around the neck of the deceased was in a very tight wad. The doctors testified that in their opinion death was due to strangulation, which in medical terms according to Dr. Philpot means death due to lack of oxygen. These facts are sufficient to create a substantial belief that Anita Wardwell died before the fire from a blow or pressure causing fractures in the thyroid and cricoid cartilages, resulting in death from lack

of oxygen, and, taken together with the occurrence of the fire, are sufficient to create a substantial belief that the crime charged had been committed by someone.

EXCEPTIONS #19 AND 20 are waived.

APPEAL.

The respondent filed a motion for a new trial, setting forth the following reasons therefor:

1. Because it is against the law and the charge of the justice.

2. Because it is against the evidence.

3. Because it is manifestly against the weight of the evidence.

4. Because respondent's counsel did not have time to adequately prepare his defense.

The motion was denied, and respondent filed an appeal.

The issue raised in the fourth reason for appeal has already been discussed under respondent's Exception #1.

The respondent took no exceptions to the charge of the presiding justice and, he does not in argument question any part of the charge. A careful reading of the charge satisfies us that the court gave a correct presentation of the law involved in the case, together with that applicable to the constitutional rights of the respondent. The respondent was ably represented by competent counsel, and his rights were fully protected.

The remaining question involved is whether in view of all the testimony in the case the jury were warranted in believing beyond a reasonable doubt that the respondent was guilty of the crime charged against him. *State* v. *Duguay*, 158 Me. 61, 74; *State* v. *Brown*, 142 Me. 106, 108; *State* v. *Wright*, 128 Me. 404, 406.

From all the evidence in the instant case, the jury was justified in believing beyond a reasonable doubt that the respondent unlawfully choked Anita Wardwell, thereby causing the fractures of the thyroid and cricoid ligaments, and resulting in her death by strangulation. There are sufficient evidence to justify the jury in finding that death occurred before the fire and that the respondent set fire to her body in an endeavor to cover his crime. Where the unlawful killing is proved, and there is nothing in the circumstances of the case as proved, to explain, qualify or palliate the act, the law presumes it to have been done maliciously, and the burden is upon the respondent to rebut the inference of malice. *State* v. *Turmel*, 148 Me. 1, 6. The respondent did not testify, and the only explanation for the act given to the officers by the respondent was that he had had an argument with his wife. This is not sufficient to rebut the inference of malice. Furthermore, the respondent told the officer that he had been planning for some time to kill his wife. In view of all the testimony in the case the jury was warranted in believing beyond a reasonable doubt that the respondent was guilty of the crime of murder as charged.

The entry will be

*Exceptions overruled.*

*Appeal dismissed.*

*Motion for new trial denied. Judgment for the State. Case remanded for sentence.*