STATE of Maine

v.

Gerald KELLEY.

Supreme Judicial Court of Maine.

July 31, 1973.

William S. Broderick, Asst. Atty. Gen., Augusta, for plaintiff.

Daniel G. Lilley, Steven P. Sunenblick, Portland, for defendant.

Before DUFRESNE, C. J. and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

Before a jury in Lincoln County Superior Court defendant was given a consolidated trial upon two separate indictments each charging defendant with the unlawful killing of a human being in manner punishable as "murder"—one indictment alleging the unlawful killing of Abbie Simmons and the other of Marion Yeaton, her daughter. On July 7, 1971 the jury returned verdicts that defendant was guilty of the felonious homicides to be punished as "murder." Defendant has appealed from the judgments of conviction.

Evidence adduced at the trial would warrant a reasonable fact-finder in arriving at the following conclusions beyond a reasonable doubt.

On September 5, 1970 the badly burned bodies of two women, identified as Mrs. Abbie Simmons, aged 79, and her daughter, Marion Yeaton, aged 58, were discovered in the charred ruins of a fire which had ravaged Mrs. Simmons' house on Storer Road in Bremen, Maine. An investigation was conducted by Detective George Massie of the Maine State Police and culminated in a report, filed on September 8, 1970, with the Bureau of Criminal Investigation that:

"Investigation shows no foul play in deaths of both subjects. The cause of death is undetermined due to the number of short circuits found in the fire."

Because of this finding of an absence of "foul play" there were no immediate postmortem examinations.

On September 30, 1970, approximately three weeks after his initial report, Detective Massie re-opened his investigation. He ascertained that Elmer Genther, nephew of Mrs. Simmons, had been among the first to come to the burning house and had attempted rescue efforts but was frustrated by the intense heat. To effect an entry into the house he had been obliged to kick open the front and side doors (the only entrances); the doors did not open when the door knobs were turned. While participating in a search of the ruins, Mr. Genther had found a hoe head (the handle of which had been burnt off) and a lock assembly. Mr. Genther delivered these items to Detective Massie on October 5, 1970.

When Mr. Genther had found the lock assembly, the bolt was positioned for the lock to be open. The hoe head had been discovered in Mrs. Simmons' bedroom, off the kitchen, in the vicinity of a desk in which Mrs. Simmons kept money; it was also near the spot at which the body of Marion Yeaton had been found. Mrs. Simmons was "very particular" about maintaining specific locations for specific items, and she had always kept the hoe by the front entrance door—a place substantially distant from the bedroom in which Mr. Genther had found the hoe head.

On October 8, 1970 the remains of the two victims had been exhumed and examined by the Chief State Medical Examiner, Dr. Charles F. Branch, a pathologist. A significant fracture of the skull of Marion Yeaton was disclosed. In Dr. Branch's expert opinion, which he supported on both direct and cross-examination by a reasoned

analysis of the data derived from observations in the post-mortem examination, the skull fracture had been caused by a blow inflicted before Marion Yeaton had died of asphyxiation and burning.[1] In Dr. Branch's opinion the blow was not caused by accidental means (such as falling out of bed, falling down stairs or being hit by a falling beam) but resulted from an externally directed blunt force inflicted by a person's use of an instrument of a type consistent with the handle belonging to the hoe head found by Mr. Genther. Further, it was a blow of sufficient severity to have rendered Marion Yeaton unconscious and thus helpless should a fire attack her in such state.

Blake McKay, the Chief Electrical Examiner of the State, had examined all the wiring and the fuse box found at the Simmons residence. He found that all of the wiring in the house conformed to the electrical code, only two 15 amp plug fuses had been blown and the conductors leading into the fuse box were in satisfactory condition. It was Mr. McKay's opinion, on the basis of his experience, that a short circuit, by itself, will not produce an electrical fire. He had been unable to discover additional factors, such as the malfunctioning of any of the electrical equipment or wiring, which, in conjunction with the occurrence of a short circuit, would indicate a fire of electrical origin.[2]

Additionally relevant to the question of whether the fire had an electrical origin was the testimony of Elmer Genther who had been in the practice of visiting the house on the average of twice a week during the summer months to assist his aunt with her affairs. He stated that within at least a week prior to the day of the fire there were only two electrical appliances in operating condition in the house, a hot plate for cooking and a radio. As to any non-electrical instrumentalities capable of producing an accidental fire by non-electrical means, Mr. Genther testified that neither Mrs. Simmons nor Marion Yeaton smoked, and the only item in the house entailing use of flame was a wood stove which his aunt used to provide heat in cold weather and, in an emergency if the hot plate was broken, for cooking.

I

One of defendant's contentions on appeal is that various extra-judicial inculpatory statements made by him were, over his objection, erroneously allowed into evidence as to each indictment. The error claimed is that the evidence aliunde the internal substantive content of the inculpatory statements was insufficient to establish, by the legally requisite quantum of proof, the "corpus delicti"—thereby to render admissible in evidence the statements of defendant.[3] Defense counsel had raised

1. The cause of Mrs. Simmons' death was likewise asphyxiation and burning.

2. Although Mr. McKay made his examination ten months after the fire, it was his opinion as an expert that such delay did not impair the validity of his conclusions.

3. Defendant made two separate admissions of guilt on separate occasions.
   The first was given four or five days after the fire when defendant was in the apartment of one, Gail Call, in Waldoboro. Defendant there told Richard Day and Paul Griffin that "he had pulled a perfect job." He said that he had gone to the Simmons residence for purposes of robbery. After Marion Yeaton had admitted him into the house he had choked one of the women to

death and hit the other on the head with the hoe. In testifying Day recalled defendant to have said that he had choked Marion Yeaton and hit Abbie Simmons with the hoe. From evidence of the post-mortem examination, it would appear that either Day or defendant had been mistaken in his recollection.
   The other admission by defendant was offered approximately two weeks later and was forthcoming while defendant was riding in an automobile owned and operated by Burton Teele. Defendant, a Rex Collamore, and Teele were returning from the Knox Hotel in Thomaston where they had been drinking. Defendant told Teele and Collamore that he had "knocked down" both Abbie and Marion, taken some money and set the house on fire.

this issue at a time after the purported foundational evidence (as described ante) had been presented and when the State was preparing to offer defendant's statements in evidence.[4]

Relying upon the recognized standard of proof as reaffirmed in State v. Wardwell, 158 Me. 307, 183 A.2d 896 (1962), the presiding Justice held that, independently of the inculpatory extra-judicial statements of defendant, the corpus delicti as to each indictment had been established, and he admitted defendant's statements into evidence as to each indictment.

The ruling of the presiding Justice was correct.

Subsequently to the trial in this case, the *Wardwell* formulation of the quantum of proof was reiterated in State v. Grant, Me., 284 A.2d 674 (1971). Under the *Wardwell-Grant* doctrine the question before the presiding Justice was whether the State had presented, independently of the internal substantive content of defendant's extra-judicial inculpatory statements,

"credible evidence which, if believed, would create in the mind of a reasonable man, not a mere surmise or suspicion, but rather a really substantial belief that . . . [the] crime [charged in the indictment] had been committed by somebody, . . . ." (p. 676)

If there was such evidence,

"a ruling of the trial court admitting a voluntary confession or admission will not be reversed." (p. 676)

■ Independently of defendant's inculpatory statements, the evidence adduced by the State was sufficient to support as reasonable, a really substantial belief, as distinguished from a mere surmise or suspicion, that: (1) a human agency had inflicted serious bodily injury upon Marion Yeaton; (2) this, conjoined with the occurrence of a fire not readily susceptible of explanation as of accidental origin and with the "foul play" inflicted upon Marion Yeaton, shows a deliberately set fire (to conceal the "foul play" or otherwise); (3) the set fire caused the death of Marion Yeaton and also of Abbie Simmons because both women were trapped in the set fire—Marion Yeaton because she had been rendered unconscious by the foul play and Abbie Simmons either because of panic, or because of general lack of mobility caused by her age or other physical condition or because she, too, had been struck, and rendered helpless, by the same person who had attacked Marion Yeaton (the blow to Abbie Simmons being impossible of discovery on post-mortem examination because of the extensive deterioration of her skull in contradistinction to the lack of deterioration of Marion Yeaton's skull); and, therefore, (4) by the application of the "felony (or arson)—murder" doctrine the killing of each of the women as the result of the deliberately set fire was not only the unlawful killing of each woman but had become an unlawful killing punishable as the most severe grade of felonious homicide—i. e., as "murder." [5]

---

4. Thus, the order of proof here followed was in accordance with that specified in State v. Grant, Me., 284 A.2d 674 (1971) as the proper practice.

5. Maine law has not hitherto dealt explicitly with the question of whether, relative to a single offense legislatively classified into different degrees, or grades, for purposes of punishment, the meaning of the "corpus delicti"—to be established by evidence independent of inculpatory extra-judicial statements of defendant as a foundational pre-condition of the evidentiary admissibility of such statements,—embraces not merely the essential elements of the offense, as such, but also those factors which delineate the grade of the offense as charged in the indictment. (For discussion of this point see NOTE, "Proof of the Corpus Delicti Aliunde the Defendant's Confession", 103 University of Pennsylvania Law Review 638, at p. 655).

## II

Defendant's other claim of error concerns an instruction by the presiding Justice to the jury.

Although the presiding Justice had himself found an adequate independent showing of corpus delicti and had admitted defendant's extra-judicial inculpatory statements into evidence, he gave to the jury the role of determining the same evidentiary admissibility issue de novo. To control the jury in this function the presiding Justice told them that as to:

". . . statements made by the accused . . . before you can consider what credibility you are going to give that testimony, you must first be satisfied by credible evidence that . . . the crime charged has actually been committed by someone. That is the corpus delicti. It is not necessary to identify the accused as the perpetrator of the crime charged before establishing the basis for the admissions of extra-judicial confessions or admissions, but before you can do that you must be satisfied that . . . Abbie Simmons and Marion Yeaton . . . their lives were taken by some criminal agency, that they did not die of natural causes or by accident. Now that is a matter for you to decide and if you cannot, if you are not satisfied that there was the probability that a crime was committed, then that is the end of the case. But in the event you are satisfied . . . if you conclude that there is a probability that a crime was committed, then you may go to the extra-judicial admissions as alleged by the State that were made by the accused. Now maybe I had better define corpus delicti as it has been defined in law. The corpus delicti means the body

or the substance of the crime and as applied to a particular offense. It means that the specific offense charged has actually been committed by someone, . . . ." Now that you must be satisfied of by probability, probability that there was a corpus delicti, . . . and if you conclude that the death of Marion Yeaton was caused by a criminal agency, probability that it was, then that is a corpus delicti. Now with respect to Abbie Simmons, . . . what inferences can you draw to whether or not . . . she died from any criminal agency, considering the circumstances of the case. That is for you to decide. . . . If you are not satisfied that there was any probability of a corpus delicti with respect to Abbie Simmons, then you need go no further with that. You could be satisfied of a corpus delicti with the probability of one with Marion Yeaton and not be satisfied with Abbie Simmons. It is for you to decide."

Defendant objected at trial, and claims on appeal, that this procedure of assigning to the jury (after the presiding Justice has already made a determination) a responsibility to decide anew the evidentiary admissibility of defendant's extra-judicial inculpatory statements, as governed by an assessment of whether the corpus delicti has been established by a quantum of proof less than proof beyond a reasonable doubt, must be held, per se, (regardless of how successfully the presiding Justice may in a given instance have drawn the necessary distinctions and separately delineated the operative standards) a violation of federal constitutional rights guaranteed to the defendant under the due process clause of the Fourteenth Amendment, including those specifically embodied in the require-

---

In the instant case we do not meet the issue. Our finding that the evidence was adequate to create in the mind of a reasonable man a really substantial belief that the death of the two women was caused by a fire deliberately set by someone, in conjunction with a violent attack upon at least one of the women, simultaneously and automatically establishes not only an unlawful killing of the two women by someone but also its liability to punishment in the grade of severity as "murder", through operation of the "felony (or arson)–murder" rule.

ments of In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Defendant's theory is that a prophylactic principle of per se prohibition is constitutionally necessary because the procedure demands that a jury of lay people must deal with essential elements constituting the offense charged by use of a duality of standards of proof, one of which is less stringent than proof beyond a reasonable doubt; and thus there inheres in the procedure a prospect of jeopardy to constitutional guarantees, too serious to be tolerable, that either (1) the jury will be confused into deciding the ultimate guilt or innocence of defendant by use of the lesser, —and, under *Winship,* unconstitutional— standard, or (2) even though attempting to apply the constitutionally correct standard. to the ultimate adjudication of guilt or innocence, the jury will derive a diluted conception of its meaning and will unconstitutionally evaluate the evidence.

We reject defendant's position.

We find analogous support for our conclusion in the rationale underlying the decisions of the Supreme Court of the United States in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

As was made clear in Lego v. Twomey, the decision in Jackson v. Denno

". . . cast no doubt upon the . . . Massachusetts procedures . . ."

for determination of the evidentiary admissibility of a confession in terms of its "voluntariness"—

". . . whereby the judge himself first resolves evidentiary conflicts and determines whether a confession is in fact voluntary . . ."

and if he has

". . . judged [it] voluntary and therefore admissible, the jury must also determine the coercion issue and is in-

structed to ignore a confession it finds involuntary." (Footnote .3 of Lego v. Twomey, 404 U.S. at p. 481, 92 S.Ct. at p. 622, referring to Footnote 8 of Jackson v. Denno, 378 U.S. at p. 378, 84 S. Ct. 1774)

With the "Massachusetts" procedure thus recognized as constitutionally acceptable, it is evident that in Lego v. Twomey the Supreme Court of the United States was giving constitutional authorization to the use of the "fair preponderance of the evidence" standard for the determination of "voluntariness" mindful that under the "Massachusetts" procedure the same jury may be called upon to work with a duality of standards: (1) fair preponderance of the evidence to determine "voluntariness" and (2) "proof beyond a reasonable doubt" as constitutionally requisite for the ultimate adjudication of guilt.

The inference is clear, therefore, that the Supreme Court of the United States perceives no infringement upon, or dilution of, Fourteenth Amendment. due process generally, or as specifically reflected by the requirements of In Re Winship, in the fact alone that a lay jury may be called upon to deal with a duality of standards of proof in the course of its total deliberations.

We recognize that there is a difference in a jury's determination of "voluntariness" by a quantum of proof less than proof beyond a reasonable doubt and its decision as to the evidentiary admissibility of extra-judicial inculpatory statements in terms of "corpus delicti." In addressing the "corpus delicti" question, the jury is called upon to evaluate, by a standard less than proof beyond a reasonable doubt, the essential elements constituting the crime— precisely those matters which, ultimately, the jury must evaluate by the more severe criterion of proof beyond a reasonable doubt to adjudicate defendant's guilt or innocence. No such involvement with essential elements of the offense arises as an incident of the "voluntariness" determination.

Although this distinction should not be ignored, we conclude that it lacks sufficiently compelling cogency to defeat the analogy deriving from the approval given the "Massachusetts" procedure, as conjoined with the Lego v. Twomey authorization of a fair preponderance of the evidence, for the assessment of "voluntariness." If the analogy be thought weakened because of the difference above mentioned, there are counterbalancing respects in which its strength is restored.

That an extra-judicial inculpatory statement of defendant is "involuntary", or "coerced", tends to detract from the reliability of its internal substantive content as a source of truth. As Jackson v. Denno observed, summarizing a traditional approach to a "coerced" confession, the "involuntariness" produces a badge of "probable unreliability." (378 U.S. pp. 385, 386, 84 S.Ct. 1774)[6]

Because there is thus a strong, though not necessary, relationship between the "involuntariness" of a defendant's extra-judicial inculpatory statement and the unreliability of its content as a source of truth, the "Massachusetts" procedure concerning "voluntariness"—as, pursuant to Lego v. Twomey, it may encompass "a fair preponderance of the evidence" basis for the determination of "voluntariness"—must be recognized as posing some jeopardy to constitutional protections. To the extent that such procedure permits a jury to find an extra-judicial inculpatory statement of a defendant "voluntary" by proof less than

proof beyond a reasonable doubt, and because the "voluntariness" of defendant's inculpatory statement markedly enhances its usual tendency, in any event, to be self-validating, it renders highly likely an eventuality that solely because the jury has found the statement admissible in evidence (on the basis of the "fair preponderance" criterion), the jury will give it controlling weight in the ultimate adjudication of guilt or innocence. In sum, under the "Massachusetts" procedure, implemented by the principle of Lego v. Twomey, the risk is precipitated of the constitutional error that a fair preponderance of the evidence may provide the real basis upon which defendant will be adjudicated guilty of the offense charged against him.

No similar infirmity, however, as incident to an effort to eliminate factors impairing internal authenticity, inheres in a procedure which requires the jury to decide the admissibility of defendant's extra-judicial inculpatory statements by a determination, in terms of a quantum of proof less than proof beyond a reasonable doubt, of the existence of a corpus delicti. Even if there be found a lack of the necessary independent proof of the corpus delicti, whatever reliability and authenticity has otherwise characterized the internal substantive content of defendant's inculpatory statements remains unimpaired. In contrast to the "voluntariness" context, a jury's inquiry into the adequacy of the proof of the corpus delicti, aliunde the internal substantive content of inculpatory statements of the defendant, is thus not

6. It may be correct that Lego v. Twomey expressed the rationale underlying the constitutional requirement promulgated by Jackson v. Denno—that a tribunal other than the jury deciding guilt or innocence must participate by making an independent determination of "voluntariness"—as concerned (not with avoiding an "erroneous . . . [finding] of guilt or innocence" but rather) with preventing the "reliability and truthfulness" which are too frequently attributed to a confession, notwithstanding that it has been "coerced", from "impermissibly . . . [influencing] a jury's

judgment as to voluntariness"—it being constitutionally necessary that the determination of "voluntariness" be made as dispassionately and accurately as possible to ". . . safeguard the [constitutional] right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances."

Yet, Lego v. Twomey could not avoid reaffirmation of the proposition, as previously noted in Jackson v. Denno, that there does exist in fact a "relationship between the involuntariness of a confession and its unreliability."

concerned with the *elimination* of particular extrinsic factors which *actively operate to impair, or destroy,* the prima facie truth-telling reliability of the internal substantive content of the statements. Rather, it is directed in the opposite direction—toward supplying extrinsic factors which, *by independent corroboration,* will *increase* the usual reliability such inculpatory statements, by their very nature, already tend to project from within.

Hence, compared one with the other, *both* procedures—(1) that by which a jury, on a standard of "a fair preponderance of the evidence", finds admissible as evidence extra-judicial inculpatory statements of a defendant in terms of their "voluntariness" and (2) that by which a jury makes an independent "corpus delicti" assessment, by a lesser standard than proof beyond a reasonable doubt, of the evidentiary admissibility of defendant's inculpatory statements—entail risks (for different reasons) that the jury may utilize the constitutionally improper lesser standard for the ultimate determination of defendant's guilt.

On balance, we find that the dangers to defendant's constitutional rights involved in the procedure by which the jury (in furtherance of a public policy which seeks extrinsic corroboration of the substantive content of the extra-judicial statements of a defendant as a reliable source of truth)[7] determines the evidentiary admissibility of defendant's statements by measuring essential elements of the offense according to a standard less stringent than proof beyond a reasonable doubt are relatively no greater than those incident to the Massachusetts procedure for "voluntariness" determinations by the "fair preponderance" criterion authorized in Lego v. Twomey.

■ Since the Supreme Court of the United States has already established (by the Jackson v. Denno-Lego v. Twomey conjunction) that in the "voluntariness" context a procedure which requires a jury to deal with a duality of standards of proof (despite risks) is, *per se,* without federal constitutional infirmity, we consider such result sufficiently analogous to support a conclusion that a similar involvement of the jury with a duality of standards of proof, when a lay jury is called upon to make the "corpus delicti" determination of the evidentiary admissibility of a defendant's extra-judicial inculpatory statements, will not, *per se,* violate the Four-

---

7. In this respect, the independent existence of the corpus delicti, as determinative of the evidentiary admissibility of extra-judicial inculpatory statements of a defendant, rests upon a foundation significantly different from that underlying the need for a preliminary determination of the "voluntariness" of such statements as an evidentiary admissibility pre-condition. We emphasized in State v. Collins, Me., 297 A.2d 620 (1972) that the "voluntariness" requirement is not simply an ordinary policy choice but ". . . reflects a high priority commitment to the principle [embodied as a constitutional guarantee—the constitutional privilege against self-incrimination] that excluded as available to government is any person's testimonial self-condemnation of crime unless such person has acted 'voluntarily' i. e., unless he has 'waived' his constitutional privilege against self-incrimination by choosing, freely and knowingly, to provide criminal self-condemnation by utterances from his own lips." (p. 626) Because of this intimate relationship to a *primary and constitutionally mandated* value, we held in *Collins* that the determination of "voluntariness" must be on the basis of the stringent standard of proof beyond a reasonable doubt, thereby to ". . . minimize the risks of allowing legal effectiveness to 'non-voluntary', or 'involuntary', testimonial self-condemnation even at the expense of producing a loss of evidence which might have probative value; . . . ." (p. 627)

No such *high priority constitutional* commitment underlies the "corpus delicti" approach to the *evidentiary admissibility* of defendant's extra-judicial inculpatory statements. Hence, it has been thought that the policy objectives of concern in this context are sufficiently promoted if the independent foundational showing of corpus delicti is tested by a less demanding standard.

teenth Amendment due process clause conceived in terms either of "fundamental fairness" or the specific "proof beyond a reasonable doubt" requirements of In Re Winship, supra.

■ Although we thus find no federal constitutional mandate prohibiting the procedure followed by the presiding Justice in the case at bar, we clarify, as our own policy choice in the formulation of the law of Maine, that it is the *exclusive* function of the presiding Justice to determine the adequacy of an independent showing of corpus delicti as the pre-condition of the evidentiary admissibility of extra-judicial inculpatory statements of a defendant.[8]

The grounds of this principle are the following: (1) in the proper allocation of the functions of judge and jury evidentiary admissibility has been traditionally, and should remain as far as possible, a matter of law for determination by the judge; (2) inculpatory statements of a defendant generally have so strong a tendency to be internally self-validating as reliable sources of truth that a jury will be unable to make a dispassionate and accurate evaluation of such extrinsic factors as may be required for the implementation of sound public policy; and (3) since, as above noted, assigning to the jury a role to decide the evidentiary admissibility of extra-judicial inculpatory statements of a defendant in terms of the adequacy of the independent proof of corpus delicti introduces a measure of jeopardy to constitutional rights of defendant, it is pointless to incur such risks by a procedure which, in any event, tends to be ineffective in achieving the public policy objectives at stake.

Hence, here, as in the analogous context of determinations of "voluntariness", and paraphrasing what we said concerning "voluntariness" in State v. Collins, supra, once the presiding Justice has made a decision concerning the adequacy of the independent showing of corpus delicti, his

". . . ruling . . . will thereupon settle the question of the evidentiary admissibility (or inadmissibility) of the . . . [extra-judicial inculpatory statements of defendant] for all purposes concerned with the further conduct of the trial. Specifically, should the presiding Justice rule that the . . . [statements are] admissible into evidence, the jury is to have no function to perform regarding . . . [their] legal admissibility . . .; the jury's considerations of the . . . [statements] will be solely for the purpose of allowing the jury to evaluate the totality of the circumstances . . . for the purpose of assigning credibility and weight to . . . [them], in the light of all of the evidence and as part of the jury's function to make the ultimate determination of guilt or innocence." (297 A.2d p. 636)

In the adjudication, on the totality of the evidence, of defendant's guilt or innocence, the jury may properly convict defendant only if it concludes beyond a reasonable doubt that the crime was committed and it was defendant who committed it. State v. Carleton, 148 Me. 237, 92 A.2d 327 (1952).

In this regard, we now resolve an ambiguity lurking in the language of a sentence in State v. Wardwell, 158 Me. 307, 183 A. 2d 896 (1962) reading as follows:

". . . when the case finally reaches the jury there must be such extrinsic

8. In State v. Carleton, 148 Me. 237, at p. 241, 92 A.2d 327, at p. 329 (1952), there is a quotation from the Alabama case of Marvin v. State, 15 Ala.App. 5, 72 So. 588 reading as follows: " 'Where evidence is introduced from which a reasonable inference of the existence of the corpus delicti may be deduced, it is the duty of the court to submit the question of the sufficiency and weight of the evidence tending to support that inference to the jury, and this is sufficient proof of the corpus delicti to permit the introduction of a confession of the defendant. . . .' "

We now clarify that any tendency of this quotation to intimate that the jury is to be involved in a determination of the evidentiary admissibility of extra-judicial inculpatory statements of a defendant was not calculated to reflect the law of Maine.

corroborative evidence of the corpus delicti as will, when taken in connection with the confession or admission, establish in the minds of the jury beyond a reasonable doubt that the crime charged was committed and that the respondent committed it." (p. 321, 183 A.2d p. 904)

It would be erroneous to derive from this phrasing the interpretation that a jury would wrongly convict a defendant if the totality of the evidence failed to include *other additional* "extrinsic corroborative evidence of the corpus delicti" to supplement: (1) the evidence of corpus delicti as only minimally adequate to qualify defendant's inculpatory statements for evidentiary admissibility and (2) the inculpatory statements themselves, as admitted into evidence. The correct interpretation of the foregoing language of *Wardwell* is, rather, that which would flow had the phrasing been as follows:

When the case finally reaches the jury, the extra-judicial inculpatory statements of the defendant can properly provide sufficient extrinsic corroboration of the corpus delicti—even if the evidence of corpus delicti has been only of the minimal quantum requisite to establish the evidentiary admissibility of defendant's statements—to support a conviction, provided that such evidence of corpus delicti, when taken together with the inculpatory statements of defendant, establishes in the minds of the jury beyond a reasonable doubt that the crime charged was committed and that the defendant committed it.

■ Thus, once defendant's extra-judicial inculpatory statements are properly admissible into evidence, they can combine with the foundational evidence of corpus delicti, even if it be only of the minimum cogency requisite to establish the evidentiary admissibility of defendant's statements, to yield, by mutual corroboration, an intensified evidentiary cogency constituting the proof beyond a reasonable doubt necessary for conviction.

■ In the case at bar, therefore, notwithstanding that the totality of the evidence may have consisted of no more than (1) the evidence of corpus delicti in the minimum degree necessary to render the extra-judicial inculpatory statements of the defendant admissible in evidence and (2) defendant's inculpatory statements themselves, the totality of the evidence, as thus constituted, was legally adequate to support the jury's ultimate adjudication of defendant's guilt. The jury will be taken to have attributed to the combined import of the evidence of corpus delicti and the defendant's extra-judicial inculpatory statements the enhanced force establishing beyond a reasonable doubt that the crime charged was committed and defendant committed it.

■ Although the procedure, as above discussed, by which the presiding Justice required the jury (in addition to himself) to make the determination of the evidentiary admissibility of the defendant's extra-judicial inculpatory statements, was improper, it may here be held to have

"given the defendant more than the sound public policy of this State warrants that he be afforded." (State v. Collins, supra, 297 A.2d at p. 635)

We stress that defendant, during trial as well as on appeal, did not dispute the correctness of the procedure, *as such,* by which the jury is called upon, in addition to the presiding Justice, to make a determination of the evidentiary admissibility of extra-judicial inculpatory statements of the defendant on the basis of adequate independent proof of corpus delicti. Rather, defendant's complaint has been directed only to the use of a duality of proof standards in such procedure—one of which is fixed as less than proof beyond a reasonable doubt.

With defendant's claim of error in this posture, and since we have already decided

that no constitutional infirmity inheres in a procedure, *per se,* by which the jury may be required to deal with such a duality of proof standards—and even though it be in the evalution of the essential elements of the crime (for distinct purposes)—the presiding Justice's submission to the jury of the evidence admissibility issue in the present context will be held reversible error only if the particular manner of the submission was so deficient, in failing adequately to differentiate between the jury's separate functions and to link each standard of proof, respectively, with the particular function to which it was applicable, that the presiding Justice had, in practical effect, made highly likely the eventuality that the jury would be confused into finding defendant guilty by proof less than proof beyond a reasonable doubt.

Viewing the instructions of the presiding Justice in their entirety, and as amplified in response to the requests for additional instructions submitted by defendant, we find no such reversible error by the presiding Justice.

Repeatedly, and in proper context, the presiding Justice emphasized that the totality of the evidence must prove beyond a reasonable doubt each essential element constituting the crime, as well as defendant's connection with the crime as its perpetrator, before defendant may be found guilty as charged in the indictments.

Except that the presiding Justice had assigned to the jury the additional function of making preliminary determinations of the evidentiary admissibility of the extrajudicial inculpatory statements of defendant, in terms of whether there had been a preliminary independent showing of a corpus delicti by a quantum of proof less than proof beyond a reasonable doubt, there would be no question that the presiding Justice had fully, and correctly, instructed the jury concerning the presumption of innocence and the burden of the State to prove all the essential elements constituting the crimes charged by proof beyond a reasonable doubt.

In connection with the evidentiary admissibility function assigned to the jury, the presiding Justice adequately differentiated it from the jury's responsibility to decide defendant's ultimate guilt or innocence on the totality of the evidence. He sufficiently confined the scope within which the jury was to use a quantum of proof less than proof beyond a reasonable doubt. And he abundantly clarified and spelled out that only upon evalution of the totality of the properly admissible evidence, measured by the (higher) standard of proof beyond a reasonable doubt as the sole governing criterion, could defendant lawfully be found guilty as charged.

The entry is:

Appeal denied.

All Justices concurring.