HARRIS, Presiding Judge.
Appellant was convicted of murder in the second degree and the jury fixed his punishment at fifteen years in the penitentiary. He was represented by retained counsel and upon arraignment pleaded not guilty. After sentence was imposed he gave notice of appeal and he is represented by trial counsel.
Appellant was charged with the shotgun slaying of his wife while they were in the process of divorce proceedings.
The evidence for the State tended to show that about 8:45 on the night of May 27, 1977, a Deputy Sheriff of Madison County, Richardson Franklin, was on routine patrol in the northeast section of Madison County. While traveling north on McCullom Road the Deputy stated that he “caught an object out of the corner of my eye.” He backed his patrol car and observed a 1967 red Ford parked on a field road off the main road on which he had been driving. He got out and walked to the Ford car and shined his flashlight inside this car and observed a black female lying across the front seat with her rear in the driver’s seat. He observed blood on her body, neck, left arm and left leg. He did not see anyone at or near the Ford automobile. He noticed a key ring on one of her fingers. He radioed for back-up units and soon two plain clothes officers arrived.
Captain Horton Lasater of the Madison County Sheriff’s Department and two other officers arrived at the scene at approximately 9:30 that night. One of the officers expressed the opinion that from the nature of the wound the deceased had been shot with a sawed-off shotgun. Later that night Captain Lasater and another officer went to the residence of the victim’s mother and were present when appellant and his brother-in-law arrived. One of the officers asked appellant if he owned a 1967 red Ford, and he replied, “Yeah, where is my wife, where is my wife,” and made a break to run. The officers caught, subdued him, handcuffed him and put him in the patrol car. He was transported to the Sheriff’s Office along with his brother-in-law.
Subsequently, appellant was given the Miranda rights and warnings. He signed a waiver of rights form and told the officers that he would make a statement. The officer asked him to write the statement, but he started crying and was so emotionally upset he asked the officer to write the statement for him. The officer wrote appellant’s statement just as he related the events that led up to his wife’s death.
The statement is as follows:
“VOLUNTARY STATEMENT
(UNDER ARREST)
“DATE 30 May 1977 TIME 12:35 AM PLACE Huntsville, Ala
“I, George Donly Petty, AM 29 YEARS OF AGE AND MY ADDRESS IS 2220 Mederis Rd, Huntsville Ala. I HAVE BEEN ADVISED AND DULY WARNED BY Leon Greene WHO HAS IDENTIFIED HIMSELF AS Investigator, Sheriff’s Dept., OF MY RIGHT TO COUNSEL BEFORE MAKING ANY STATEMENT, AND THAT I DO NOT HAVE TO MAKE ANY STATEMENT AT ALL, NOR INCRIMINATE MYSELF IN ANY MANNER. I HEREBY *531 EXPRESSLY WAIVE MY RIGHT TO THE ADVICE OF COUNSEL, AND VOLUNTARILY MAKE THE FOLLOWING STATEMENT TO THE AFORESAID PERSON, KNOWING THAT ANY STATEMENT I MAKE MAY BE USED AGAINST ME ON THE TRIAL OR TRIALS FOR THE OFFENSE OR OFFENSES CONCERNING WHICH THE FOLLOWING STATEMENT IS HEREIN MADE. I DECLARE THAT THE FOLLOWING STATEMENT IS MADE OF MY OWN FREE WILL WITHOUT PROMISE OF HOPE OR REWARD, WITHOUT FEAR OR THREAT OF PHYSICAL HARM, WITHOUT COERCION, FAVOR OR OFFER OF FAVOR, WITHOUT LENIENCY OR OFFER OF LENIENCY, BY ANY PERSON OR PERSONS WHOMSOEVER.
“G.D.P. I requested Leon Greene to write this statement for me because I am not able to write. I left my momma’s house about six fifteen on Friday night, the 27 of May 1977, to take an invitation to James Hambrick. I was on my way over to James’s house, when something hit me that Deborah Davis gets off from work about five thirty or six o’clock. Deborah goes down Meriadianville bottom road all the time. I went down the gravel road off the paved road on the second curve. I parked my car by a lane facing the paved road. I was sitting on the back of the car with my gun, a sawed off shotgun. I don’t know what gauge it is, a twelve or sixteen. I sat there about fifteen or twenty minutes when Gloria, my wife passed by. She backed up and came down the gravel road where I were. She asked me what was I waiting on down there. I told her I was waiting on Deborah. She asked me for what. I told her to take care of what I called her for the other night, I meant Deborah. She asked me, ‘do you think Deborah is coming down here, because the other night when you called her, Deborah called the Police.’
“I said, ‘if she don’t come, I’ll go catch her.’ Gloria asked me what I was going to do with the gun. Her car was pulled up into the lane behind my car on the road. She was sitting in her car and I was standing beside the car on her side. Gloria asked me to let her see the gun, I told her she didn’t need it. She told me I was the one that didn’t need it, she said, ‘if Deborah doesn’t come who else is coming, the Blizzard girl.’ I told her no. She reached out and caught hold of the end of the gun. I snatched the gun back and it went off, Gloria fell back onto the seat, I called her but she didn’t say nothing. I went to my car and left.
“I went to James Hambrick’s house and left the invitation. Before I went to James Hambrick’s house, I drove to my brother’s grave at Petty’s Cemetery by Buckham School. I left from there, went to Hambriek’s house, then to my mother’s house. I took the shotgun into the house and set it in the corner of my brother’s room. I went outside where W. D. Strong, Mary Petty; Sarah Petty Whit-more and Jimmy Strong, my sister Betty Petty, Marie Petty, my brother John and a friend of John’s, Joe Ed Corn. Me and W. D. left and went to Hardy’s. We got something to eat, went back to my mother’s house. They all decided to go to Mary’s house and play cards. After we were playing cards, my mother called me and said Elnora Walker had called her, that’s Gloria’s sister, asked me if I had seen Gloria. I told them no. W. D. and I went to Elnora’s house. We left there and went to CIT to see if she was working. I did this to cover the fact that Gloria was already dead. We left from Elnora’s house, in my car, went to Gloria’s mother’s house in New Market.
“That’s when the Police were there when we got there. They told me they had a found a red Ford and asked me if I owned a red Ford. I told them yes and they brought us down here to the Sheriff’s Department. I denied any knowledge of Gloria’s death until now.
“I was alone when Gloria was shot.
“I HAVE READ THIS STATEMENT CONSISTING OF 4 PAGE(S), AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED THEREIN.
*532 “THIS STATEMENT WAS COMPLETED AT 1:14 AM ON THE 31 DAY OF May, 1977.
“WITNESS: /s/ Leon Greene
“WITNESS:
/s/ George D. Petty
Signature of person giving voluntary statement”
Outside the presence and hearing of the jury the State laid all proper predicates going to show that no threats, promises, rewards, or other inducements were made to appellant to get him to sign the confesso-ry statement. The Court held that the statement signed by appellant was knowingly, voluntarily and intelligently made and that it would be admitted into evidence. Back before the jury all pre-Miran-da and Miranda predicates were properly laid and appellant’s signed statement was admitted into evidence and read to the jury.
An officer went to appellant’s mother’s home and asked her for his shotgun. She voluntarily gave him the sawed-off gun. The officer testified that he smelled the barrel, and in his opinion the gun had been fired recently.
Appellant testified and denied the contents of his signed statement. He further testified that he did not shoot his wife. He offered alibi evidence by several witnesses.
Appellant contends that the State failed to prove the corpus delicti and it was therefore error to admit his confessory statement into evidence.
In Favors v. State, Ala.Cr.App., 355 So.2d 103, this Court recently held:
“The argument is made that defendant’s conviction violates the rule requiring corroboration of a defendant’s confession or incriminating statement by evidence of the corpus delicti. The argument is based on an erroneous assumption that proof of the corpus delicti must include evidence of defendant’s guilty connection with the alleged crime. In Arnold v. State, 57 Ala.App. 172, 326 So.2d 700, 701 (1976) it was held:
“ ‘Proof of the corpus delicti does not necessarily include evidence connecting defendant with the crime. The term, meaning body of the offense, connotes the actual commission of the crime by someone.’ ”
John Kilbourn, a toxicologist with the State of Alabama, testified that cause of death was internal bleeding as a result of the gunshot wound and death resulted very rapidly. His testimony proved the corpus delicti and made admissible the incriminating statement made by appellant.
It is not within the province of the Court of Criminal Appeals to pass judgment on the truthfulness or falsity of conflicting evidence. Williams v. State, Ala.Cr.App., 348 So.2d 1142; Freeman v. State, Ala.Cr. App., 350 So.2d 768.
Alibi evidence is always a jury question. Washington v. State, 55 Ala.App. 116, 313 So.2d 544; Freeman v. State, supra.
As we have pointed out when appellant was asked if he owned a 1967 red Ford he attempted to flee. At this time he had not been questioned as to the death of his wife. Evidence of flight, or attempted flight, was material on the question of appellant’s guilt. Ala.Dig. Homicide @==>774(7).
All questions raised on this appeal were properly submitted to the jury and as the Supreme Court said in Young v. State, 283 Ala. 676, 220 So.2d 843,
“Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State’s evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error.”
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.