STATE of Maine

v.

Timothy L. ANDERSON and Edward G. Sabatino.

Supreme Judicial Court of Maine.

Dec. 31, 1979.

Charles K. Leadbetter, Michael D. Seitzinger (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Dunlap, Wood & O'Brien by Mark E. Dunlap (orally), Portland, for Anderson.

Childs, McKinley & Emerson, Richard S. Emerson, Jr. (orally), Portland, for Sabatino.

Before McKUSICK, C. J., POMEROY, WERNICK and ARCHIBALD, JJ., and DUFRESNE, A. R. J.

DUFRESNE, Active Retired Justice.[1]

The defendants, Timothy L. Anderson and Edward G. Sabatino, were charged in a two-count joint indictment with the murder of Joseph H. Lalumiere, Sr. on January 25, 1978 in violation of 17–A M.R.S.A., § 201(1)(A)[2] and with the concurrent crime of robbery in violation of 17–A M.R.S.A., § 651(D)(E).[3] They were tried together in the Superior Court, Cumberland County, before a jury impaneled on July 26, 1978, which, after taking a view of the scene of the crime and receiving evidence during the period of five days, returned, on August 1, 1978, verdicts of guilty of murder and robbery against each defendant.

On appeal, defendant Anderson contends that (1) the evidence was insufficient to support the verdict of guilty on the murder count; (2) his pretrial motion for severance was erroneously denied; (3) adoptive admissions were erroneously admitted in evidence without proper foundation; (4) the admission in evidence of his own extrajudicial admissions violated the corpus delicti rule; (5) statements made by a prosecution witness should have been excluded on the ground that they were obtained through a violation of that witness' *Miranda* rights; (6) the jury was erroneously instructed on the definition of the mens rea element of murder under 17–A M.R.S.A., § 201(1)(A); and (7) the trial court erred in failing to give defendant's requested instruction on the inherent trustworthiness of excited utterances.

Defendant Sabatino appeals on the ground that the trial Court erroneously instructed the jury on the elements of accomplice liability. He contends that, if the Court had correctly construed the accomplice liability statute (17–A M.R.S.A., § 57(3)(A)), the Court would have been compelled to grant Sabatino's motion for a directed verdict of acquittal on the murder count. Sabatino also joins in Anderson's contention that the admission in evidence of their extrajudicial admissions violated the corpus delicti rule.

We reject each claim of error raised by the defendants and accordingly we deny the appeals.

*Facts of the Case*

The jury would have been warranted in finding the following facts.

On January 24, 1978 Anderson and Sabatino were present when one John Taylor purchased a .22-caliber pistol from Sabatino's cousin, Dennis Splude. Taylor borrowed the money to purchase the gun from Anderson.

On the following day, January 25, 1978, Anderson and Sabatino arrived at Taylor's apartment on Cumberland Avenue in Portland, Maine at about 5:00 p. m. Present in the apartment at that time were John Taylor, Michelina Collelo Taylor, Norman Estes and Henry Lewis. The defendants asked John Taylor if they could borrow his pistol in order to use it to commit a robbery at the

1. Sitting by assignment.

2. 17–A M.R.S.A., § 201(1)(A) provides:
 § 201. *Murder*
 1. A person is guilty of murder if:
 A. He intentionally or knowingly causes the death of another human being;
 * * * * * *

3. 17–A M.R.S.A., § 651 in pertinent part reads as follows:
 § 651. *Robbery*
 1. A person is guilty of robbery if he commits or attempts to commit theft and at the time of his actions:
 * * * * * *

B. He threatens to use force against any person present with the intent
 * * * * * *
(2) to compel the person in control of the property to give it up or to engage in other conduct which aids in the taking or carrying away of the property;
C. He uses physical force on another with the intent enumerated in paragraph B, subparagraphs (1) or (2),
D. He intentionally inflicts or attempts to inflict bodily injury on another; or
E. He or an accomplice to his knowledge is armed with a dangerous weapon in the course of a robbery as defined in paragraphs A through D.

Elm Ice and Coal Co. of Portland, Maine. Taylor agreed to lend them the gun. The flip of a coin was used to determine who would be carrying the gun. As a result thereof, Anderson took possession of the firearm. The defendants made masks out of pullover hats and then left the Taylor apartment together in Sabatino's car.

At about 5:45 p. m., the dead body of Joseph H. Lalumiere, Sr., the owner of the Elm Ice and Coal Co., was found in a chair on the premises of his business at 30 Washington Avenue in Portland, Maine. A subsequent autopsy revealed that Lalumiere died from a bullet which passed through his chest, heart and lung.

At 6:00 p. m. that evening, Anderson and Sabatino returned to the Taylor apartment and changed their clothes. Anderson stated that the two of them had gone to Elm Ice and Coal where Anderson had demanded money of Joseph Lalumiere. Anderson related that the victim had reached into a bag, causing Anderson to think that Lalumiere was going for a gun, and that it was at this point Anderson shot Lalumiere. Anderson further told Lewis, Estes and the Taylors that he had meant to shoot Lalumiere in the arm, just to wound him. Both Anderson and Sabatino stated that Sabatino was standing near the victim with a pair of ice tongs during the incident. The defendants stated that they left without taking any money. They told John Taylor they would get rid of the gun. Both defendants then left the Taylor apartment.

On the 26th of January, the defendants again went to the Taylor apartment, and Sabatino told Taylor that he had thrown the gun in the water from a bridge in Falmouth. Police later recovered a .22-caliber pistol from the water, and ballistic tests showed that the bullet which killed Lalumiere came from that gun.

At their joint trial, both defendants took the stand and admitted that they went to the Elm Ice and Coal Co. to rob Lalumiere. Both testified, however, that they intended to use the gun only to scare Lalumiere. Sabatino claimed he did not know that the gun was loaded. Anderson stated that he knew it was loaded and that he fired once at Lalumiere intentionally, but that he meant only to wound him in the arm, not to kill him. Anderson further added that, after firing the single action pistol once, he pulled the hammer back to prepare the gun for a second shot, but he did not fire at Lalumiere again; instead, he fled from the scene, discharging the second shot into the pavement outside the premises.

## I. Anderson Appeal

### A. Murder Instructions

Defendant Anderson claims reversible error in the Justice's instructions to the jury in relation to what constitutes "knowing" conduct underlying one type of culpable state of mind in murder. We disagree.

To support a conviction of murder under 17–A M.R.S.A., § 201(1)(A), the State must either prove that it was the defendant's "conscious object" to cause the death of his victim (17–A M.R.S.A., § 10(1)(A)) [the culpable state of mind intended by the term "intentionally" in the murder statute—see note 2, supra] or that the defendant was aware that it was "practically certain" that his conduct would cause Lalumiere's death (17–A M.R.S.A., § 10(2)(A)) [the culpable state of mind intended by the term "knowingly" in the reference murder statute]. The trial Justice did instruct the jury correctly respecting the requisite mens rea in murder when he explained to them what was meant by "intentional" and "knowing" conduct necessary to support the prerequired culpable state of mind in the crime of murder. Although the Maine Criminal Code definitionally states that a person acts knowingly with respect to a result of his conduct when he is aware that it is "practically certain" that his conduct will cause such a result, here, the trial Justice did not confine himself to the exact statutory definition, but told the jury, in the alternative, that the defendant acted knowingly if he knew that death would "almost certainly" result from his conduct. We reject the defendant's contention that the Justice's amplification in his definition of knowing conduct introduced a lower standard of evidentiary proof than the statutory require-

ment or practical certainty between cause and effect.

The word "certain," standing alone, used in the context of cause to effect, connotes, amongst other things, the sense of being exact and precise, sure and dependable. It is the antonym of doubtful. When conjoined with either of the words "practically" or "almost," it then loses its characteristic of absolute exactitude or definitive sureness and embraces, instead, the qualitative concept of certainty to all practical purposes though not entirely or absolutely so (practically) or certainty to a very close degree of correctness (almost). Webster's Third New International Dictionary, in defining the word "practically," indicates the near-identical conceptualization of the two terms, since one of the meanings given to "practically" is "nearly," "almost." In our view, the jury understood the dual phraseology as being synonymous. There was no error.

### B. *Sufficiency of the Evidence in Proof of Murder*

Defendant Anderson argues that the evidence was insufficient to prove that he "intentionally" or "knowingly" killed Lalumiere, and that, at most, the evidence supports a conviction of manslaughter only. This argument is to no avail.

The State's evidence showed that the fatal bullet which killed Lalumiere passed through the victim's chest, heart and lung. Anderson himself testified that he knew the gun was loaded, that he intentionally pulled the trigger, and that, after firing once, he pulled back the hammer of the single action pistol in preparation for a second shot.

■ Where the existence of a culpable state of mind such as a conscious object to cause death (intentional conduct) or an awareness that it is practically certain that death will result from the actor's conduct (knowing conduct) is a necessary constituent of the crime of murder, the intent with which the accused committed the acts underlying the criminal accusation must be proved as any other fact beyond a reasonable doubt. Such proof of the accused's intent at the time of the commission of the

alleged criminal act may be drawn from the act itself or from the existing circumstances surrounding the incident, as well as from any other evidence having a legitimate tendency to shed light upon the accused's intent or mental state at the time. See *State v. Gagne*, Me., 362 A.2d 166, 174 (1976); *State v. Pinnette*, Me., 340 A.2d 17, 21 (1975); *State v. Eaton*, Me., 309 A.2d 334, 339 (1973).

■ Thus, the defendant's testimony regarding his subjective intent at the time the shooting occurred was admissible evidence, because it could have an important bearing with the jury in revealing the defendant's state of mind. See *State v. Clark*, Me., 394 A.2d 779, 782 (1978).

■ One's state of mind, since it is the result of a mental process, may be established by direct proof of it from the person who has formulated the foundational intent, but such evidence, although competent, is not conclusive upon the triers of fact. *State v. Nathan*, 138 Conn. 485, 86 A.2d 322 (1952); *People v. Levan*, 295 N.Y. 26, 64 N.E.2d 341, 345 (1945). The accused may testify as to his state of mind at the time of the homicide, but the jury is not bound by his statement and may consider the attendant circumstances in resolving the true character of his act, including the degree of criminality involved therein. See *Walker v. People*, 175 Colo. 173, 489 P.2d 584, 586 (1971).

■ The jury was not required to accept Anderson's testimony that he merely intended to wound Lalumiere by shooting him in the arm. The location of the fatal bullet wound supported the contrary inference that the defendant intended to kill Lalumiere. In addition, Anderson's testimony that he fired when he saw Lalumiere was making a move for a gun supports the conclusion that the defendant shot to kill Lalumiere in order to preserve his own life. Finally, the conclusion that Lalumiere's death was Anderson's conscious object is further supported by Anderson's own testimony that he pulled back the pistol hammer to prepare it for a second shot, indicating

that he was prepared to finish the job of killing Lalumiere, if a second shot proved necessary to accomplish that result.

Alternatively, the jury could conclude that, even if it was not Anderson's purpose to kill Lalumiere, the evidence that he fired a shot into the victim's chest from a relatively close range supports the conclusion that Anderson was aware that his conduct made Lalumiere's death "practically certain".

We conclude that the evidence adduced by the State was sufficient to support the jury's verdict that Anderson was guilty, beyond any reasonable doubt, of the murder of Joseph H. Lalumiere, Sr., and that the jury was justified in rejecting Anderson's exculpatory statements in the face of attendant physical facts and conduct so unreasonable and inconsistent with the experience of mankind. See *State v. Bevineau*, 460 S.W.2d 683, 688 (Mo.1970).

C. *Denial of Pretrial Motion to Sever*

On March 31, 1978 Anderson's counsel filed a motion to sever his trial from that of Sabatino pursuant to Rule 14, M.R.Crim.P.[4] The motion for severance stated that "only the co-defendants are in a position to know who committed the crime for which they are charged." It further alleged that, from what occurred at a pretrial bail hearing, Sabatino's trial strategy would be to place all blame for the murder on Anderson. Asserting that prejudice from a joint trial was "inherently probable," given the possibility of antagonistic defenses, Anderson's counsel prayed that Anderson and Sabatino be tried separately.

On April 12, 1978 a hearing was held on the motion. The presiding Justice heard the legal arguments of counsel but received no evidence. The sole ground advanced by Anderson's counsel in support of his motion was the possibility of "antagonistic defenses." Although Anderson's argument was based on testimony adduced at a prior bail hearing, the transcript of that hearing was not presented to the Justice hearing the pretrial severance motion until May 1, 1978, eleven days after the presiding Justice denied the severance motion.

■ At no time during the trial did Anderson renew his motion for severance, nor did the trial Justice deem it necessary to grant a severance, *sua sponte*, to protect the rights of either defendant.[5]

■ We have noted on prior occasions that joint trials are generally favored in the interest of conserving judicial resources, avoiding duplicative trials, minimizing the public expenditure of funds and promptly bringing the accused to trial. See *United States v. Barber*, 442 F.2d 517, 529 (3rd Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971), quoted in *State v. Rich*, Me., 395 A.2d 1123, 1128 (1978). On the other hand, a criminal defendant is guaranteed the right to confront and cross examine all witnesses against him, and this right, secured by the Sixth and Fourteenth Amendments to the Federal Constitution, may be jeopardized where a co-defendant's extrajudicial statements incriminating the defendant are admitted in evidence, and the declarant does not take the stand at the joint trial. See *Parker v. Randolph*, —— U.S. ——, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *State v. Wing*, Me., 294 A.2d 418 (1972), we set out in detail the procedure to be followed, where one defendant demands a severance on the ground that a co-defendant's extrajudicial statements will be admitted at trial, to avoid endangering the

---

4. Rule 14, M.R.Crim.P. provides:

"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

5. Once a joint trial commences, the presiding justice has a continuing duty to keep a watchful eye over the proceedings and to order a severance if prejudice does appear. *State v. Colomy*, Me., 407 A.2d 1115 (1979); *State v. Rich*, Me., 395 A.2d 1123, 1128 (1978); *State v. Peaslee*, Me., 388 A.2d 910, 912 (1978); *State v. Saucier*, Me., 385 A.2d 44, 46 (1978); *State v. Elwell*, Me., 380 A.2d 1016, 1020 (1977).

defendant's Sixth-Fourteenth Amendment confrontation rights. The *Wing* court approved of the practice proposed by the American Bar Association's Project on Standards for Criminal Justice, Advisory Committee on the Criminal Trial § 2.3.[6]

 No detailed pretrial examination of the substance of co-defendant Sabatino's extrajudicial statements was conducted in this case. The failure to conduct this inquiry, however, is attributable to the failure of Anderson's defense counsel to indicate clearly in his March 31, 1978 severance motion that Sabatino's incriminating extrajudicial statements were at the heart of Anderson's contention that he would suffer prejudice from a joint trial. The mere mention of "antagonistic defenses" was not sufficient to alert the motion Justice that a potential *Bruton* problem existed. Thus, we find no error in the motion Justice's denial of Anderson's pretrial severance motion.

 The record clearly shows, however, that the trial Justice was well aware of the *Bruton* problem and that he discussed it thoroughly with all counsel before the trial began. The prosecuting attorney explained that he intended to use extrajudicial statements made by both defendants and that each in their respective statements implicated the other. The State intended to avoid any *Bruton* problem, so he maintained, by demonstrating that each co-defendant affirmed and adopted the extraju-

dicial statements of the other, thus making them admissible against both defendants, as the admissions of one, and the adoptive admissions of the other.[7] Where the statements of a co-defendant are adopted by the other defendant, the Sixth Amendment confrontation clause is no longer operative, since the defendant's constitutional privilege is to enjoy the right to be confronted with, i. e. to cross-examine, the witnesses against him, not himself.

In assessing the trial Justice's decision not to order a severance of the joint trial, we must address the issue, whether or not the trial Justice properly concluded that the extrajudicial statements of co-defendant Sabatino were adopted and affirmed by defendant Anderson.

### D. *Adoptive Admissions*

Anderson contends that Sabatino's extrajudicial statements were not admissible against him, because the State's evidence did not show that he, Anderson, adopted Sabatino's statements as his own. There are two sets of statements made by Sabatino which are challenged by Anderson, those made *prior* to the robbery and those made following its commission.

### (i) *Statements made prior to the robbery*

The State called as witnesses Norman Estes, Henry Lewis and John Taylor. Their challenged testimony concerning Sabatino's extrajudicial admissions is set forth in the margin.[8] In *State v. Elwell*, Me., 380 A.2d

---

6. Section 2.3 provides:
 "Severance of Defendants.
 "(a) When a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court should determine whether the prosecution intends to offer the statement in evidence at the trial. If so, the court should require the prosecuting attorney to elect one of the following courses:
 "(i) a joint trial at which the statement is not admitted into evidence;
 "(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively *deleted; or*
 "(iii) severance of the moving defendant."

7. Rule 801(d)(2)(B), M.R.Evid. provides that the admission of a party is not hearsay if it is: "a

statement of which he has manifested his adoption or belief in its truth . . . .."

8. Norman Estes testified that the defendants stated "they wanted the gun. That they were going to use it to make themselves some money . . . . Eddie [Sabatino] had said that he got oil at Elm Ice and thought he wanted to go down there to do a job . . . Eddie said he bought oil at Elm Ice and that the man down there had a lot of money on him."
 Henry Lewis testified that "Timmy Anderson and Eddie Sabatino was talking about doing a robbery down at Elm Ice and Oil with the gun . . . Timmy and Eddie were both talking more or less about the same time about doing a robbery down at Elm Ice and Oil."
 Finally, John Taylor related that "Timmy Anderson said do you still want to go down to Elm

1016, 1020 (1977), we noted that "[t]he mere fact of a declarant's presence at the time a statement is made is insufficient in itself . . . to warrant a conclusion that the nondeclarant adopted the statement. The proponent of the statement has the burden of demonstrating acquiescence in the statement by the nondeclarant." In the case at bar the trial Justice concluded that the State had met its burden by proving that Anderson acquiesced in the incriminating extrajudicial statements made by Sabatino. We find no error in this ruling.

■ There was far more than the "mere presence" of Anderson to support the conclusion that he adopted Sabatino's statements that the two of them intended to commit a robbery at the Elm Ice and Coal Co. The State's evidence showed that at all times during which Sabatino's extrajudicial statements were made, Anderson was in close proximity to Sabatino, so that he clearly heard and understood what Sabatino said. Anderson affirmed Sabatino's statements concerning the planned robbery by (1) participating in the coin toss to see who would carry the gun; (2) helping to make masks out of their pullover hats; and (3) leaving with Sabatino in Sabatino's car with the pistol in his possession. These factual circumstances are adequate to distinguish *State v. Elwell,* supra, and to support the admission of the first set of Sabatino's extrajudicial statements.

(ii) *Statements made after the robbery*

On direct examination, Henry Clayton Lewis, Jr., a State witness, when asked: "what, if anything, do you remember that Edward Sabatino and Timothy Anderson said at that time? [i. e. back at the Taylor

home after the trip to the Elm Ice Company]," answered:

"Well, Timmy Anderson and Eddie Sabatino said that *they* had to shoot the guy." (Emphasis supplied)

On cross-examination by counsel for Anderson, the following colloquy took place.

"Q. Well, I think you testified that you didn't remember whether Eddie said something about what happened at Elm Ice or whether Timmy said it?

"A. *No.* They were both more or less talking at the same time." (Emphasis added)

■ Assuming that the cross-examination did not sufficiently clarify Lewis' previous testimony to mean that both, Anderson and Sabatino, while in close proximity to each other, had respectively blurted out "that they had to shoot the guy" and that there was insufficient evidence to indicate which one of the two defendants had made the statement, nevertheless, we conclude that there was no error in the admission in evidence of the statement, even if viewed as an extrajudicial admission by codefendant Sabatino. Indeed, Lewis had further testified on direct examination that Anderson told him that "when he [Anderson] pulled the trigger he had aimed for the guy's shoulder." This was an explicit corroboration by Anderson of the particular statement made by Sabatino, if he did make it, on the issue regarding who shot Lalumiere. Such corroborative statement on the part of Anderson was more than sufficient to render any extrajudicial statement by Sabatino the adoptive admission of Anderson.[9]

Ice and Eddie Sabatino said they're still open, I just rode by."

9. Even if we were to assume, arguendo, that Anderson did not adopt Sabatino's incriminating statements, we would, nevertheless, affirm Anderson's conviction for two reasons.

First, we note that Sabatino took the stand and testified at trial, thereby subjecting himself to cross-examination by Anderson's counsel. Under such circumstances, Anderson cannot claim that his Sixth-Fourteenth Amendment right to confrontation was infringed. *Califor-*

*nia v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

Second, any assumed error in the admission of an extrajudicial statement which did not qualify as an adoptive admission on the part of Anderson would have to be considered harmless and nonprejudicial, since Anderson himself took the stand and testified that he shot Lalumiere, thus corroborating substantially the incriminating extrajudicial statements of his codefendant.

## E. *Corpus Delicti Rule*

Both Anderson and Sabatino contend that, at that point during the trial when the State first introduced their extrajudicial admissions, the corpus delicti of the crime of murder had not been established by the evidence independently of their incriminating extrajudicial statements and that it was reversible error to admit the same in evidence.

True, in *State v. Davis*, Me., 374 A.2d 322 (1977), we stated that

"[i]t is now well-established law in Maine that the corpus delicti of the crime of unlawful homicide punishable as murder consists of:

(1) evidence creating a substantial belief that the identity of the deceased is the person named in the indictment as the victim;

(2) evidence creating a substantial belief that the crime charged had been committed by someone." (Emphasis provided) Id. at 324.

From the underscored terminology, the defendants argue that, under the corpus delicti rule, the State was obliged to produce evidence substantiating all the elements of the crime charged (in this case, murder under section 201(1)(A)), including the mens rea element of an intentional or knowing killing, before any incriminating admissions could be admitted. The State, on the other hand, claims that the underlying reason for the corpus delicti doctrine rests in the desire to safeguard an accused against the possibility of being convicted of an alleged crime not in fact committed (see *State v. Hoffses*, 147 Me. 221, 224, 85 A.2d 919, 921 (1952)) and that this basic purpose of the rule is satisfied, in the instant case, once the State proves that an unlawful homicide occurred. The State maintains that the rule should not require proof of the particular mens rea factor accompanying the unlawful homicide, the several culpable states of mind with which the unlawful homicide is committed, although constituting elements of the crime charged, being by legislative edict determinative of the degree or grade of the single offense of unlawful

homicide for the purpose of punishment. This issue was expressly reserved and left undecided in *State v. Davis*, supra at 325, n. 3. See also *State v. Kelley*, Me., 308 A.2d 877, 880, n. 5 (1973). But cf. *State v. Lund*, Me., 266 A.2d 869, 877 (1970), where the evidence was deemed "sufficient to establish the corpus delicti of unlawful homicide, whether manslaughter or murder."

The formula articulating the standard of proof in the application of the corpus delicti rule has been expressed by this Court both ways. In the more recent cases, the rule was said to require that, at the time confessions or inculpatory admissions of an accused are sought to be introduced in evidence, the State must have presented sufficient credible evidence as will create a really substantial belief that *the crime charged* has actually been committed by someone. *State v. Wardwell*, 158 Me. 307, 321, 183 A.2d 896, 904 (1962); *State v. Atkinson*, Me., 325 A.2d 44, 46, n. 2 (1974); *State v. Davis*, supra (1977). But, in *State v. McPhee*, 151 Me. 62, 65, 115 A.2d 498, 500 (1955) and in *State v. Jones*, 150 Me. 242, 245, 108 A.2d 261, 262 (1954), the evidentiary proof under the rule was stated to require that the State have presented sufficient credible evidence to raise a really substantial belief that *a crime* has actually been committed by someone.

We view the rule in its use of either phraseology as not projecting an all-inclusive concept. Proof that *a crime* has been committed by someone does not mean any crime without reference to the particular offense charged against the accused, nor does proof of *the crime charged* purport to intend more than a showing that the criminal act itself was committed, in the instant case, the criminal homicide, whoever may have been the perpetrator and whatever may have been his state of mind.

 We agree with the State's contention that the policy behind the corpus delicti rule is to avoid the possibility that someone will be falsely convicted of a crime when in fact no crime was committed. *State v. Grant*, Me., 284 A.2d 674, 675 (1971). In the case of any criminal homi-

cide, whether the charge be murder or manslaughter, the rule is satisfied when there is sufficient evidence to support a really substantial belief that the basic unlawful homicide was committed by someone. In such circumstances, neither the identity of the perpetrator nor his state of mind constitute an essential ingredient of the corpus delicti within the meaning of the corpus delicti rule, so-called. These may be proved through the use of the defendant's own inculpatory statements.[10] See Veldorale: "The Principle of Corpus Delicti and the Evidence Pertaining Thereto," 39 Temple L.Q. 1, 22 (1965).

In the case at bar, to establish the corpus delicti of a criminal homicide, whether it be punishable as murder or manslaughter, the State had to present enough evidence to support a substantial belief that Lalumiere's death had been caused by a criminal agency and was not due to suicide, accident or natural causes. *State v. Shanahan,* Me., 404 A.2d 975 (1979).

In *State v. Cazier,* 521 P.2d 554 (Utah 1974), a negligent homicide case, the defendant contended, as Anderson does in this case, that the "corpus delicti" of the crime included the *total* proof of *all of the elements* necessary to convict him of the crime charged, including that he was the driver of the automobile, under the influence of intoxicating liquor, and that he negligently caused the death. The Court ruled that such was not so, since the term "corpus delicti" refers only to evidence that a crime has been committed.

The death of a human being may be brought about by any one of four means: (1) natural causes; (2) accident; (3) suicide; or (4) criminal means. In establishing the corpus delicti of murder, two elements must be established: (1) the fact of death of the victim; and (2) the criminal agency of another responsible for that death. *Tertrou v. Sheriff, Clark County,* 89 Nev. 166, 509 P.2d

970 (1973). See also *People v. Amaya,* 40 Cal.2d 70, 251 P.2d 324 (1952).

We find no error in the ruling of the trial Justice that the prerequisites of the corpus delicti rule had been met at the time the defendant's inculpatory statements were admitted in evidence. Indeed, the State's evidence showed that the victim's body was discovered by a passerby slumped over in a chair behind a counter at his place of business with a single bullet hole in his chest. The victim did own a "bb-pellet" pistol which was found on the floor between his feet. Undoubtedly, this firearm was kept nearby for his protection, since he operated a fuel supply business on the cash basis and had a long standing practice of keeping large amounts of cash in his office. On January 25, 1978 some two thousand dollars had already been turned in by the company's delivery drivers to Lalumiere at the time of his death. The State medical examiner had testified that Lalumiere was shot with a .22-caliber bullet, which was retrieved from the body at the autopsy thus indicating that Lalumiere did not take his own life with the "bb-pellet" gun. Within minutes of the time when he was found dead slumped in his chair, Lalumiere had spoken with his daughter and she testified that her father sounded normal, testimony militating against suicide. The particular wound from the .22-caliber bullet obviously ruled out death by accident or due to natural causes. The absence of a .22-caliber pistol anywhere near the victim pointed exclusively to death being caused by the criminal agency of another.

### F. *Miranda Violation*

Anderson complains about certain extrajudicial inculpatory statements made by John Taylor, a prosecution witness, which were taken by the police, so it is claimed, in violation of Taylor's *Miranda* rights and which were admitted at trial

---

10. Requiring the State to prove that the criminal act was done with a particular state of mind in the perpetrator is tantamount to requiring the State to prove the identity of the person who committed the crime, a require-

ment that was never contemplated by the formulation of the common law corpus delicti rule. See 7 J. Wigmore, Evidence § 2072 (Chad.rev.ed.1978). See also *Petty v. State,* Ala.Cr.App., 358 So.2d 529 (1978).

over Anderson's objection. This point of appeal is without merit as the Fifth–Fourteenth Amendment right to be free from self-incrimination is a personal privilege which adheres to the person and may not be vicariously asserted by a third party. *State v. Melvin,* Me., 390 A.2d 1024–1029 (1978); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).[11]

### G. *Excited Utterances Instruction*

 Anderson's next point on appeal is that the Superior Court Justice committed reversible error in refusing to charge the jury as requested that Anderson's extrajudicial statements made to John Taylor, Norman Estes, Henry Lewis and Michelina Collelo Taylor, while in a nervous state, immediately upon returning to the Taylor apartment after the shooting were "inherently trustworthy" statements within the excited utterance principle as defined by Rule 803(2), M.R.Evid. These statements, as variously testified to, were to the effect that Anderson did not intend to kill Lalumiere, that he did not mean to shoot the guy, that he aimed for the man's shoulder, that he wished he hadn't shot the man.

There is no merit to this claim. In the first place, the statements were not admitted under the excited utterance exception to the hearsay rule, but under Rule 801(d)(2) as admissions offered against the defendant as his own statements. Secondly, even if the statements had been admitted as excited utterances under Rule 803(2), M.R.Evid., that would not justify a binding instruction by the presiding justice to the jury that such utterances are "inherently trustworthy." Their admission in evidence as excited utterances would only mean that the statements had, preliminarily at least, overcome the presumption of untrustworthiness which the hearsay rule generally

attaches to extrajudicial statements, on the theory that they were made under conditions which stilled the voice of reflective self-interest and suspended the individual's powers of fabrication. As any other evidence, however, their reliability remains for ultimate jury assessment. As in the case of dying declarations, it would have been the task of the jury to determine the weight and credibility to be given to Anderson's declarations, if admitted as excited utterances, assigning to them such weight, or none at all, as in their judgment the underlying facts proved or disproved that the statements were factually made under the stress of excitement caused by the coincident event or shortly resulting therefrom and were not the result of a reflecting mind seeking exculpatory excuses. See *State v. Chaplin,* Me., 286 A.2d 325, 332 (1972). The trial Justice was correct in leaving to the jury the issue of the trustworthiness of Anderson's extrajudicial statements.

### 11. *Sabatino's Appeal*

#### A. *Accomplice Liability for Murder*

Defendant Sabatino contends that the trial Court erroneously instructed the jury on the nature of accomplice liability.

The Maine Criminal Code specifically regulates accomplice responsibility in criminal activity in section 57, which, in pertinent part, provides as follows:

"§ 57. *Criminal liability for conduct of another; accomplices*

"1. A person may be guilty of a crime if it is committed by the conduct of another person for which he is legally accountable as provided in this section.

"2. A person is legally accountable for the conduct of another person when:

\* \* \* \* \* \*

C. He is an accomplice of such other person in the commission of the crime, as provided in subsection 3.

---

11. Accord: *State v. Lankford,* 31 N.C.App. 13, 228 S.E.2d 641, 646 (1976); *United States v. Haddad,* 527 F.2d 537, 539 (6th Cir. 1975); *People v. Kurzydlo,* 23 Ill.App.3d 791, 320 N.E.2d 80, 84 (1974); *United States v. Skolek,* 474 F.2d 582, 584 (10th Cir. 1973); *United States v.*

*Bruton,* 416 F.2d 310, 312–313 (8th Cir. 1969), cert. denied, 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428; *United States v. Minor,* 398 F.2d 511, 513 (2nd Cir. 1968); *Howard v. United States,* 397 F.2d 72, 74 (9th Cir. 1968).

"3. A person is an accomplice of another person in the commission of a crime if:

A. With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime. *A person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of his conduct; or . . . .*"

The trial Justice instructed the jury that there were two different ways in which Sabatino could be found to be an accomplice to the crime of murder defined in 17–A M.R.S.A., § 201(1)(A). First, the jury could find that Sabatino intended to promote or facilitate the commission of the crime of murder by Anderson. Sabatino made no objection to this portion of the trial Justice's charge.

The trial Justice then explained to the jury that there was a second alternative: Sabatino could be found to be an accomplice to murder if Sabatino intended to promote or facilitate the crime of robbery, and murder was a reasonably foreseeable result of his conduct in the commission of the robbery. Sabatino contends that this instruction was erroneous, because the second sentence of § 57(3)(A)

["A person is an accomplice under this subsection to any crime the commission of which was a reasonably foreseeable consequence of his conduct."]

must be read as setting forth an additional requirement of accomplice liability, rather than an alternative form of accomplice liability. He argues that accomplice liability for a crime committed by another does not exist unless that crime was both *intended* by the alleged accomplice *and reasonably foreseeable.* Such a construction, however, would render the second sentence of § 57(3)(A) superfluous, for, if the commission of a crime is intended, it will always also be reasonably foreseeable, since one cannot intend to accomplish something that

is unforeseeable. At any rate, this issue was laid to rest in *State v. Goodall*, Me., 407 A.2d 268 (1979), in which this Court held that the stated second sentence of the reference section must be read independently from the first sentence. Thus, under the first sentence, liability for a "primary crime" (here robbery) is established by proof that the alleged actor-accomplice intended to promote or facilitate that primary crime of robbery. But, under the second sentence, liability for any "secondary crime" (here murder) which may have been committed by the principal actor is established as to the alleged actor-accomplice upon a two-fold showing: (a) that the actor-accomplice intended to promote the primary crime (here robbery), and (b) that the commission of the secondary crime (here murder) was a "foreseeable consequence" of the actor-accomplice's participation in the primary crime of robbery.

This Court concluded in *Goodall* that "the legislature indeed intended to impose liability upon accomplices for those crimes that were the reasonably foreseeable consequence of their criminal enterprise, notwithstanding an absence on their part of the same culpability required for conviction as a principal to the crime," and

that the legislature was doing nothing more than adopting the "established rule" of accomplice liability which existed in Maine prior to the enactment of the Maine Criminal Code. See *State v. Simpson*, Me., 276 A.2d 292, 295 and note 2 (1971).

### B. Felony Murder

Sabatino was convicted of the crime of murder under 17–A M.R.S.A., § 201(1)(A), i. e. "intentional" or "knowing" murder, the punishment of which is imprisonment in State Prison for life or for any term of years that is not less than 25. 17–A M.R.S.A., § 1251. The jury was instructed by the presiding Justice that they could find Sabatino guilty of murder as charged in the indictment on the theory that he was Anderson's accomplice in either one of the two ways which 17–A M.R.S.A., § 57(3)(A) par-

ticularizes as foundational requirement for criminal accountability as an accomplice: (1) if, with intent of promoting or facilitating the secondary crime of murder, he (Sabatino) aided or attempted to aid Anderson in the commission of the crime of murder itself, or (2) if, with intent of promoting or facilitating the primary crime of robbery, he aided or attempted to aid Anderson in the commission of the crime of robbery and the commission of the crime of murder by Anderson was a reasonably foreseeable consequence of his (Sabatino's) participation in the robbery. The jury returned a verdict of "guilty as charged on Edward Sabatino." Thus, we can only surmise on which of the two theories the jury reached their conclusion.

On our own motion, we will consider what effect, if any, the felony-murder statute (17–A M.R.S.A., § 202)[12] has on the accomplice statute (17–A M.R.S.A., § 57) when applied to the "intentional-knowing" murder statute (17–A M.R.S.A., § 201). If the coexistent felony-murder section (§ 202) must be considered as a repeal of, or an exception to, the accomplice statute (§ 57(3)(A)), when the accomplice statute is applied in a case of "intentional-knowing" murder (§ 201(1)(A)), this would raise the issue, whether Sabatino, by reason of the given instructions, was deprived of a fundamentally fair trial. Since the point was not raised by the defendant, we review the matter under the "manifest error-serious injustice" standard. *State v. Hathaway*, 161 Me. 255, 211 A.2d 558 (1965); *State v. LeBlanc*, Me., 290 A.2d 193 (1972); *State v. Perry*, Me., 408 A.2d 1300 (1979); *State v. Baker*, Me., 409 A.2d 216 (1979). Rule 52(b), M.R.Crim.P.

The evidence indicates that Sabatino's participation in the killing of Lalumiere does come within the ban of both statutes. We agree that the accomplice statute is a statute of general application, while the felony-murder statute is a special statute dealing with a homicide committed in the perpetration of specific felonies, one of which is robbery. We note that the penalty for "intentional-knowing" murder is more severe (life or any term of years that is not less than 25) than the sentence which one found guilty of felony-murder could receive (not more than 20 years). Both statutes must be viewed as concurrent legislation, since the accomplice section and the felony-murder section became part of the Maine Criminal Code from the beginning, felony-murder being originally criminal homicide in the 3rd degree.[13] We note that the indictment did not charge felony-murder, a crime which is not a lesser included offense in the crime of murder under 17–A M.R.S.A., § 201(1)(A). See *State v. Snow*, Me., 383 A.2d 1385 (1978).

We concede the general rule of statutory construction is that, where there are two statutory provisions, one of which is special and particular and definitely includes the alleged criminal conduct in ques-

---

12. 17–A M.R.S.A., § 202 provides as follows:
§ 202. Felony murder
1. A person is guilty of felony murder if acting alone or with one or more other persons in the commission of, or an attempt to commit, or immediate flight after committing or attempting to commit murder, robbery, burglary, kidnapping, aggravated arson, arson, rape, gross sexual misconduct, or escape, he or another participant in fact causes the death of a human being, and such death is a reasonably foreseeable consequence of such commission, attempt or flight.
2. It is an affirmative defense to prosecution under this section that the defendant:
A. Did not commit the homicidal act or in any way solicit, command, induce, procure or aid the commission thereof;

B. Was not armed with a dangerous weapon, or other weapon which under circumstances indicated a readiness to inflict serious bodily injury;
C. Reasonably believed that no other participant was armed with such a weapon; and
D. Reasonably believed that no other participant intended to engage in conduct likely to result in death or serious bodily injury.
3. Felony murder is a Class A crime.

13. Criminal homicide in the 3rd degree was defined in Public Laws, 1975, c. 499, § 1 in the same terminology as the present felony-murder section 17–A M.R.S.A., § 202—(Public Laws, 1977, c. 510, § 39), except for the use of the comprehensive term "Class A crime" instead of the present enumeration of the underlying specific felonies involved.

tion, and the other general, which, if standing alone, would include the same conduct, the special provision is to be taken as intended to be an exception to the general provision, if the two provisions are contemporaneous, or to be a repeal of the general, if the two enactments were passed at different times, as the Legislature is not to be presumed to have intended a conflict. See *State v. Cann*, 92 Wash.2d 193, 595 P.2d 912 (1979).

Our own Court has said that the stated general rule whereby special legislation prevails over general legislation is *usually* and *ordinarily* the applicable rule of construction to be used in such circumstances, and especially where the two statutes punishing the same conduct provide different penalties for their violation. *State v. Taplin*, Me., 247 A.2d 919, 922 (1968); *State v. London*, 156 Me. 123, 129, 162 A.2d 150, 154 (1960). (But see *Thompson v. Edgar*, Me., 259 A.2d 27 (1969); *State v. Bryce*, Me., 243 A.2d 726 (1968)).

We said, however, in *Beckett v. Roderick*, Me., 251 A.2d 427 (1969) that legislative intent which is inferable from an overall analysis of a statutory package must control. It is only when it appears from the legislation that the Legislature actually so intended, that special legislation *may* take precedence over general statutory provisions. It is the court's duty to seek

"to perceive in both of the legislative enactments a comprehensive legislative design objectively manifested and consistent with both enactments. If such foundational legislative scheme can be reasonably discerned, any subsidiary and utterly irreconcilable inconsistencies are then to be dealt with in a manner which tends to promote the underlying legislative purposes to which both enactments have germane relationship." *Opinion of the Justices*, Me., 311 A.2d 103, 108 (1973).

■ Unless it does clearly appear that the Legislature intended otherwise, the existence of a specific criminal statute will not preclude prosecution under a more general criminal statute. *State v. Kuuku*, 595 P.2d 291 (Haw.1979); *United States v. Go-*

mez-Tostado, 9th Cir., 597 F.2d 170 (1979); *People v. Donahue*, Colo.App., 578 P.2d 671 (1978); *United States v. Young*, 376 A.2d 809 (D.C.App.1977).

The Legislature said as much when it enacted 17-A M.R.S.A. § 13, which reads:

"The existence of a crime other than the one charged, but based on the same conduct or arising from the same criminal episode, for which a person may be prosecuted, whether that crime is a lesser or greater crime as to elements or sentencing classification, shall not preclude prosecution for the offense charged *unless a contrary legislative intent plainly appears.*" (Emphasis added)

■ Where a statute, such as the instant accomplice statute, is merely auxiliary or cumulative, it may be that the Legislature intended both statutes to coexist, and the fact that there is overlapping and a prohibition of identical conduct will not necessarily mean that a defendant can only be prosecuted under the statute which carries the lesser penalty. See *State v. Fary*, 16 N.J. 317, 108 A.2d 593 (1954); *State v. Allen*, 1 Ariz.App. 161, 400 P.2d 589 (1965); *People v. Lubow*, 29 N.Y.2d 58, 67, 323 N.Y.S.2d 829, 834, 272 N.E.2d 331, 335 (1971); *People v. Hulse*, 557 P.2d 1205 (Colo.1976).

In *Fuller v. State*, Me., 282 A.2d 848, 851 (1971), a case in which the same principle of law was raised on an analogous state of facts, we said that, where the

"issue—of whether one statute which fails in express terms to deny the effective force of another statute in whole or in part has, nevertheless, accomplished such result by implication—

\* \* \* \* \* \*

[i]t is important to emphasize . . . that the fundamental nature of the inquiry is the ascertainment of the overall legislative design. In this context, then, it will be recognized that no single factor will necessarily be absolutely controlling under all circumstances. Furthermore, while cases will often refer to, and apply, various principles of statutory interpreta-

tion, the emphasis must remain that such rules are utilized only as aids and guides rather than as controlling determinants."

As stated in *Fuller,* supra, "approaching the issue in this vein," we conclude that the Legislature has failed to manifest a design that 17–A M.R.S.A. § 202, the felony-murder provision, is to be deemed as rendering ineffective the accomplice statute when used in connection with 17–A M.R.S.A., § 201(1)(A), the "intentional-knowing" murder section; rather, that it was the intent of the Legislature to maintain both provisions as a beneficial comprehensive scheme in the enforcement of the law against murder by providing a device whereby judicial and prosecutorial resources may be conserved in the operation of the criminal justice system. The Legislature was aware that the crime of murder is, more often than not, committed in the course of robberies, burglaries, kidnappings, arsons, rapes and gross sexual misconduct cases, in which proof of the underlying felony could be easily made and admissions of guilt to the incidental murder would be more readily acceptable, if the ensuing penalty did not involve the capital punishment of "life" in prison. The same rational purpose for giving concurrent vitality to the two statutes exists as supports the policy motivation for sanctioning the practice of the negotiated plea. With the inherent flexibility of two possible sanctions for criminal homicides of the felony-murder variety, both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty of life imprisonment for murder, and may settle for an admission of guilt under the felony-murder provision which carries a lesser penalty. For a defendant who sees slight possibility of acquittal in connection with the commission of the underlying felony, the advantage of pleading guilty to felony-murder and limiting the ensuing probable penalty is obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical griefs of a trial are eliminated. For the State, the promotion of such possibilities are also advantageous— an early punishment upon admission of guilt, even though the penalty be a lesser one, would most probably more effectively attain the objectives of criminal law enforcement; plus, with the avoidance of a trial, scarce judicial and prosecutorial resources will be conserved in those cases where there may exist a serious doubt that the State can maintain its burden of proof. See *State v. Corbitt,* 74 N.J. 379, 378 A.2d 235 (1977).

The Legislature undoubtedly had these purposes in mind when both statutes were enacted side by side. The Maine Criminal Code reflects a legislative intent to introduce flexibility in our criminal law system. In 17–A M.R.S.A. § 13–A(3), it is provided [and this would be applicable in the instant case where Sabatino was indicted only under § 201(1)(A) and not under § 202] as follows:

"The court in its discretion may instruct the jury to consider, or may as factfinder consider, any other offense or another alternative of the offense charged, although that other offense or alternative is not a lesser included offense, if:

A. On the basis of the evidence, there is a rational basis for finding the defendant guilty of the other offense;

B. The other offense does not carry a greater penalty than the offense charged;

C. Both the State and the defendant consent to the consideration of the other offenses by the factfinder; and

D. The defendant waives any applicable right to an indictment for the other offense . . . ."

Thus, where a single act violates more than one statute, the State may elect to proceed against the accused under either statute. *State v. Kuuku,* supra; *State v. Fary,* supra; *United States v. Young,* supra. The discretion to choose under which to prosecute is vested in the prosecuting attorney and the grand jury, provided no impermissible invidious discrimination is involved. Id. Contra: *State v. Cann,* 92 Wash.2d 193, 595 P.2d 912 (1979).

■ The indictment did validly charge murder under 17–A M.R.S.A. § 201(1)(A) and Sabatino's conviction thereof by the application of the accomplice statute (17–A M.R.S.A. § 57(3)(A)) was legally obtained, notwithstanding the existence of the felony-murder statute, under which Sabatino could also have been indicted. There was no error, let alone manifest error.

The entry will be:

The respective appeals of Anderson and Sabatino are denied.

Judgment of conviction of murder under 17–A M.R.S.A. § 201(1)(A) as to Anderson affirmed.

Judgment of conviction of murder under 17–A M.R.S.A. § 201(1)(A) as to Sabatino affirmed.

Remanded to the Superior Court for further proceedings consistent with this opinion.

DELAHANTY and GODFREY, JJ., did not sit.